IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION


IN THE MATTER OF:            )
                            )
KWITCHURBELIAKIN, LLC       )       CASE NO. 10-30824
                            )       Chapter 11
                Debtor.     )


    HEARING had before the Honorable Harry C. Dees, Jr., Judge, United States Bankruptcy Court, in the above-entitled matter in Bankruptcy Court, 401 South Michigan Street South Bend, Indiana 46601, on the 22nd day of March, 2010, at approximately 2:00 o'clock p.m.  Said hearing recorded by the Courtroom Deputy for the United States Bankruptcy Court and caused to be reduced to writing by Sue Cowen, a Notary Public in and for the State of Indiana.

_____

Sue Cowen, C.S.R.
3407 Broadway
Fort Wayne, Indiana  46807
(260) 744-2816

APPEARANCES:

        For Debtor                        Rosalind G. Parr
                                          Attorney at Law
                                          105 W. 86th Avenue
                                          Merrillvile, IN  46410


        For U. S. Trustee                 Alexander L. Edgar
         Nancy J. Gargula                 Attorney at Law
                                          One Michiana Square, Fifth Floor
                                          100 East Wayne Street
                                          South Bend, IN  46601


        For Creditor                      Mark L. Phillips
         LaPorte Savings Bank             Attorney at Law
                                          Newby Lewis Kaminsky & Jones
                                          916 Lincolnway Street
                                          LaPorte, IN  46350-3412

I N D E X

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| RUSSELL KLOSINSKI | DIRECT EXAMINATION | |
| | BY MR. PHILLIPS | 6 |
| | CROSS-EXAMINATION | |
| | BY MS. PARR | 13 |
| | CROSS-EXAMINATION | |
| | BY MR. EDGAR | 22 |
| | REDIRECT EXAMINATION | |
| | BY MR. PHILLIPS | 24 |
| | RE-CROSS-EXAMINATION | |
| | BY MS. PARR | 27 |
| | | |
| LARRY BURCHIEL | DIRECT EXAMINATION | |
| | BY MR. PHILLIPS | 29 |
| | CROSS-EXAMINATION | |
| | BY MS. PARR | 33 |
| | REDIRECT EXAMINATION | |
| | BY MR. PHILLIPS | 46 |
| TODD APFEL | DIRECT EXAMINATION | |
| | BY MS. PARR | 48 |
| | CROSS-EXAMINATION | |
| | BY MR. PHILLIPS | 64 |
| | CROSS-EXAMINATION | |
| | BY MR. EDGAR | 72 |

| EXHIBITS | RECEIVED |
|---|---|
| Creditor's Exhibits 1 through 9 | Page 4 |
| Debtor's Exhibits A, B, and C | Page 4 |

1        THE COURT:  Number 10-30824 in matter of

2   Kwitchurbeliakin, LLC, an expedited hearing on a motion for

3   appointment of a Trustee filed by LaPorte Savings Bank.  And

4   I understand you're Mr. Phillips?

5        MR. PHILLIPS:  I am, Your Honor.  Yes.

6        THE COURT:  You are.  Okay.  And have you entered your

7   appearance for the Bank?

8        MR. PHILLIPS:  That was entered this morning, Your

9   Honor.

10       THE COURT:  Okay.  Fine.

11       MR. PHILLIPS:  I'm pinch hitting for Mr. Adamsky who was

12   in another hearing and couldn't get away.

13       THE COURT:  Okay.  Fine.  And you're Miss Parr?

14       MS. PARR:  Yes, I am.

15       THE COURT:  Okay.  Couple of things, Miss Parr.  First

16   of all, you're late.  Second of all, I'm wondering why the

17   Court has to bear the expense of making copies for you.  Of

18   your exhibits.  Typically a well-prepared lawyer will have

19   enough copies made for the parties and for the Court.

20            But, having gotten that off my chest...  This

21   is your motion, Mr. Phillips.  Would you like to open?

22       MR. PHILLIPS:  Yes, Your Honor.  I'll be very brief in

23   my opening statement.  We do have --

24       THE COURT:  Sir, could you use the podium, please?

25       MR. PHILLIPS:  Beg your pardon?

2

1          THE COURT:  Use the podium when you address the Court.

2          MR. PHILLIPS:  Thank you.  Your Honor, I'll be brief in

3     my opening remarks, because we have at least three witnesses

4     that need to testify.

5          THE COURT:  Okay.

6          MR. PHILLIPS:  We believe, on behalf of LaPorte Savings

7     Bank, that we need to have a Trustee appointed here in lieu

8     of allowing the Debtor to remain in possession of this

9     business.  We think that under Section 1104(a) of the

10    Bankruptcy Code that we need to have a Trustee appointed

11    because we believe there's some dishonesty, fraud,

12    incompetence, and gross mismanagement with respect to the

13    business that's being conducted here and run by the Debtor in

14    Possession.

15              We understand that there is a high standard of

16    proof.  We intend to meet that high standard of proof.  We

17    intend to show to the Court that this, this Debtor has run

18    this business into the ground in a short period of time.  We

19    intend to show that there has been a long history of very

20    profitable owners of this business; they've been able to run

21    this business, the bowling alley, and make considerable sums

22    of money in a very short period of time.  This Debtor has

23    turned that situation completely around and has demonstrated

24    through its behavior an incompetence and an inability to run

25    the business profitably.

                                    3

1           There is still hope for the creditors if we

2     can have a Trustee appointed and we think it's going to be in

3     the best interests of the Trustee that -- or, excuse me --

4     best interests of the creditors and the Bankruptcy Estate

5     that the Trustee be appointed in order to try to keep this

6     business moving as we generate a plan of reorganization.

7           We hope to show and intend to show that what's

8     occurred here is that the Debtor has, in fact, operated his

9     business under -- with a sister corporation, a dual existence

10    and has peeled away the cash from the business into this

11    second corporation, which we'll have evidence to show.  The

12    Creditor, LaPorte Savings Bank, is a secured creditor.  My

13    client has lost faith and lost confidence in the abilities of

14    Debtor to run and manage its business and for that reason

15    we'll ask, at the conclusion of the evidence, that a Trustee

16    be appointed under 1104.

17        THE COURT:  Okay.  Thank you.  Miss Parr, do you have an

18    opening statement?

19        MS. PARR:  Just a very brief opening statement.   First

20    of all, let me apologize to the Court for being late, but my

21    navigation system took me to the wrong building.  Secondly, I

22    had provided copies to all the parties.  I simply had not

23    provided four copies to the Clerk of the Court.

24            In regard to the Creditor's motion, pursuant

25    to Section 1107, a Debtor who then becomes the Debtor in

4

1    Possession shall have all the rights and powers of a Trustee

2    subject to certain limitations, of course.  And that we

3    believe that Kwitchurbeliakin is entitled to exercise those

4    rights and powers of the Trustee and that there is no

5    sufficient basis for a Trustee to be appointed in this case.

6    Thank you.

7        THE COURT:  Okay.  Call your first witness,

8    Mr. Phillips.

9        MR. PHILLIPS:  Yes.  We'll call Mr. Rus Klosinski,

10   please.

11       MR. EDGAR:  Your Honor, before we start, just one brief

12   procedural matter.  I've prepared something of a time line

13   and gave you some values for the court to follow names,

14   dates, and so forth.  I provided copies to both Counsel.  I'm

15   not giving this to the Court as evidence, but merely as a

16   demonstrative aid.

17       THE COURT:  Any objections to the Court --

18       MR. PHILLIPS:  I've --

19       THE COURT:  -- having that?

20       MR. PHILLIPS:  It's accurate, Your Honor.  No objection.

21       THE COURT:  Okay.  Miss Parr, any objection?

22       MS. PARR:  No objection.

23       THE COURT:  All right.

24       MR. PHILLIPS:  One other, one other procedural matter,

25   Your Honor.  We do have an agreement among Counsel as far as

1  the admission of exhibits and Creditor's Exhibits 1 through

2  -- I think we have nine?  Yes.  1 through 9 can be received

3  into evidence without objection.

4      THE COURT:  And Debtor's A, B, and C?

5      MR. PHILLIPS:  Correct.

6      THE COURT:  Okay.  Is that your understanding,

7  Miss Parr?

8      MS. PARR:  Yes, it is.

9      THE COURT:  Okay.  Sir, could you come up here, face the

10  Clerk, raise your right hand, and take the oath?

11  (Whereupon, Deponent sworn in by the Courtroom Deputy.)

12      COURTROOM DEPUTY:  Please take the stand.

13

14  RUSSELL KLOSINSKI, having been first duly sworn to tell the

15  whole truth, was examined and testified as follows:

16

17  DIRECT EXAMINATION BY MR. PHILLIPS:

18      Q.  State your name for the record and spell your --

19      A.  Russell Klosinski.

20      Q.  -- last name?  Could you spell your last name?

21      A.  K-l-o-s-i--s-k-i.

22      Q.  What is your position with the Creditor, LaPorte

23  Savings Bank?

24      A.  Executive Vice President.

25      Q.  How long have you been employed and worked for the

6

1    Bank in that capacity?

2        A.    Just one month short of twenty-five years.

3        Q.    Can you tell the Court your involvement with the

4    loan that's the subject of this proceeding here, the loan

5    between LaPorte Savings Bank and the company called

6    Kwitchurbeliakin, LLC?

7        A.    Sure.  At the time loan was made I was the lending

8    officer on the loan.

9        Q.    And were you familiar with the business that was

10   being purchased with the proceeds of this loan?

11       A.    Yes.  Very familiar with it.

12       Q.    Can you tell the Court what that business was?

13       A.    Well, it operates as Thunderbird Bowling, Bowling

14   Center on Pine Lake Avenue in LaPorte.  We have had the --

15   we'd had the loan on the business for many years prior to

16   Mr. Apfel buying the property.  We had the, had the loan on

17   it during Mr. Burchiel's ownership.  Prior to that,

18   Mr. Osborne's ownership and prior to that, Mr. McCoy's

19   ownership.  I would say at least a total of fifteen years or

20   more.

21       Q.    Okay.  And has the experience of the Bank been...

22   Let me ask a question.  What has been the experience of the

23   Bank with regard to the ability of competent operators of

24   this business to be able to meet the demands of the loan

25   obligations?

1      A.   The loan had been paid on time without exception

2      for all the prior owners.

3           Q.   Now, the loan with Kwitchurbeliakin has fallen into

4      arrears?

5           A.   That is correct.

6           Q.   And how many -- how long has it been since you've

7      received a mortgage payment?

8           A.   Next month will be a year.

9           Q.   And as the... And is it also true that the Debtor,

10     the corporation, Kwitchurbeliakin, has also failed to pay

11     real estate taxes for the last two years?

12          A.   That is my understanding that that is correct also,

13     yes.

14          Q.   All right.  Are you... Do you have personal

15     knowledge of what's happened at this bowling alley?

16          A.   Yes, I do.  Up until this year I bowled there

17     myself for thirty years.

18          Q.   And can you tell the Court what's happened with

19     this bowling alley under the management of the current Debtor

20     in Possession?

21          A.   Well, the equipment itself and the building have

22     both deteriorated.  There are a number of the monitors that

23     were not working.  There is...  The roof is, is been leaking

24     and there's even been plastic bags stapled up to the roof to

25     all -- deter the water in other directions.  Just...  The

8

1  parking lot has not been resurfaced in a number of years,

2  which it was always done prior, previously every year before

3  the season started and that has not happened.  Just a general

4  deterioration of the entire business.

5      Q.   And has the -- has the business also lost a number

6  of its leagues and its youth bowlers?

7      A.   It's lost the majority of the youth bowlers, it's

8  lost at least nine, nine leagues, mine being one of them.

9  Our, our league this year moved to another house within

10 LaPorte.  It's is not that the bowlers have quit bowling.

11 They simply moved to the other house in LaPorte.

12     Q.   And what was the reason for that?

13     A.   General conditions of the center as well as

14 perceived attitude in the business.

15     Q.   Is the business being competently run?

16     A.   It is not.

17     Q.   Has it been managed correctly?

18     A.   Has not.

19     Q.   Now, has the...  Has the Bank, as the secured

20 creditor here, lost its confidence in the ability of the

21 Debtor in Possession to run and manage its business?

22     A.   Yes, definitely.

23     Q.   Why is that?

24     A.   Again, we have...  It's been almost a year since

25 our payment had been received.  We've seen the leagues

9

1    leaving.  It's just a shell of what it was previously.

2         Q.   Did you also learn, Mr. Klosinski, that -- that...

3    That there had been a second or sister corporation

4    established by the Debtor in Possession?

5         A.   I know of that now, yes.

6         Q.   And can you tell the Court with -- what you know

7    about that situation?

8         A.   I believe it's a -- it's a contractual arrangement

9    between the two entities; the one to lease the property to

10   the other.

11        Q.   Direct your attention to Creditor's Exhibit 4.  May

12   I approach the witness?

13        THE COURT:  Yes.

14        MR. PHILLIPS:  Thank you.

15        Q.   Is Creditor's Exhibit 4 the lease that you

16   discussed?

17        A.   Yes.

18        Q.   And that lease agreement has a date on it of 2005?

19   Is that correct?

20        A.   May 31st, 2005.  Yes.

21        Q.   Was that at or near the time that you entered this

22   loan arrangement with the Debtor?

23        A.   It's approximately that date.  I believe you have

24   the note there.

25        Q.   When did you first learn of this lease agreement?

10

1          A.    Of the actual lease agreement?  It was very, very

2     recent.  I think when Mr. Adamsky brought it up to me.

3          Q.    Within the last six months?

4          A.    Yes.

5          Q.    Does your mortgage document with the Debtor require

6     that there be an accounting for the, for the rental payments?

7          A.    Yes, I believe it does.

8          Q.    If you look at the lease agreement, it calls for

9     more than a hundred fifty thousand dollars a year in rental

10    payments.  To your knowledge have any of those rental

11    payments been made?

12         A.    Not to my knowledge.

13         Q.    Direct your attention to Creditor's Exhibit 1.

14    Again, Your Honor, may I approach the witness?

15         THE COURT:  Yes.

16         MR. PHILLIPS:  Q.  Is Creditor's...  Is Creditor's

17    Exhibit 1 a copy of the formal documents, the title work, the

18    mortgages and the promissory notes signed by the Debtor?

19         A.    Yes, it is.

20         Q.    And who are the two people that are, in fact, the

21    owners and managers of the Debtor?

22         A.    Todd Apfel and Luise Lesser.

23         Q.    And is Todd Apfel in the courtroom today?

24         A.    Yes, he is.

25         Q.    Now, if you return your attention to the commercial

11

1    lease agreement?  Can you see...

2        A.   Yes.

3        Q.   Can you tell us who signed those, that lease

4    agreement?

5        A.   Todd Apfel and Luise Lesser.

6        Q.   So, they leased it back and forth between

7    themselves?

8        A.   Yes.  That's correct.

9        Q.   And you've indicated that the property taxes are in

10   arrears at least two years?

11       A.   Yes.

12       Q.   Now...  Have you made demand upon the Debtor for

13   payment of the debt?

14       A.   Yes, we have.

15       Q.   And despite that demand, it has not been met.

16       A.   That's correct.

17       Q.   Why are you asking the Court for this extraordinary

18   remedy of the appointment of a Trustee in this case?

19       A.   We don't feel the business can be run successfully

20   with Mr. Apfel there.

21       Q.   And is that based upon his demonstrated past

22   practices?

23       A.   Yes, that's correct.

24       MR. PHILLIPS:  Okay.  Thank you.  I'll pass the witness,

25   Your Honor.

1          THE COURT:  Okay.  Cross-Exam?

2

3    CROSS-EXAMINATION BY MS. PARR:

4          Q.   Mr. Kolinski(phonetic), you testified earlier about

5    the general condition of the building.

6          A.   Yes.

7          Q.   Have you personally gone out to the building and

8    made observa- -- personal observations about the condition?

9          A.   Yes, I have.

10         Q.   And when was the last time you did that?

11         A.   I was there the day...  I was there the day that

12   Mr. Burchiel took over as, as the Receiver.  That was

13   approximately three weeks ago.

14         Q.   And what was it that you observed?

15         A.   Again, as I mentioned, the condition of the parking

16   lot.  There is...  There were problem with their -- there's

17   problems with their roof.  The...  It's been leaking.

18   There's been plastic bags, you know, here and there in the

19   building.  And at that time I -- the lanes were not on; so, I

20   couldn't observe at that point in time the condition of the

21   monitors, because the lanes were turned off when I was there.

22         Q.   You testified on Direct that the business is not

23   competently run.  Which business are you making a reference

24   to?

25         A.   I'm talking about the operation of Thunderbird

                                    13

1   Lanes, which is, obviously, combined between the two of these

2   entities.  I don't believe the rent payments have been made;

3   so, I guess it would apply to both.

4        Q.   Are you aware that this hearing is in regards to

5   Kwitchurbeliakin alone?

6        A.   That's what...  That's the entity that we were

7   aware of, yes.

8        Q.   And, so, you testified earlier that you had taken

9   the opportunity to review this commercial lease agreement,

10  which has been marked as Creditor's Exhibit A; is that

11  correct?

12       MR. PHILLIPS:  I think that was 4, wasn't it?

13       MS. PARR:  Q.  4.  I'm sorry.

14       MR. PHILLIPS:  Yes.  4.

15       MS. PARR:  Q.  It's my...  I'm sorry.  Creditor's

16  Exhibit 4?

17       A.   I'm sorry.  Can you repeat the question?  I lost

18  what it was.

19       Q.   Have you had the opportunity to review what has

20  been marked as Creditor's Exhibit 4, the commercial lease

21  agreement?

22       A.   I...  I have here.  Yes.

23       Q.   Oh, okay.  That's where it is.  Okay.

24            Have you read this agreement?

25       A.   I'm sorry?

14

1          Q.   Have you read the agreement?

2          A.   Not the entire agreement, no.

3          Q.   And are you aware that there is a separate entity,

4     Arnie's Bowling and Recreation Center, Inc., that is leasing

5     that property?

6          A.   I am now.  Yes.

7          Q.   Okay.  But isn't it true that if Arnie's Bowling

8     and Recreation Center, Inc., is leasing that property, then

9     Kwitchurbeliakin's sole function is as landlord?

10         A.   I'm not sure I'm qualified to speak of that.  That

11    sounds like a legal question.

12         Q.   You testified earlier about the business not being

13    competently run.  Is it your belief that it is

14    Kwitchurbeliakin that is operating the business?

15         A.   I believe it's Mr. Apfel that's operating the

16    business.

17         Q.   Are you aware that he's Vice President of Arnie's

18    Bowling and Recreation, Inc.?

19         A.   I am now.  Most of where he's -- owns

20    Kwitchurbeliakin.

21         Q.   You also testified on Direct that the business is

22    not managed correctly.  What business are you making a

23    reference to?

24         A.   I'm talking about Thunderbird Lanes, the operating,

25    the entity that people go into and use.

15

1          Q.   Are you aware that it is Arnie's Bowling and

2     Recreation Center, Inc., that is operating Thunderbird Lanes?

3          A.   Again, I am now, but I wasn't then.

4          Q.   Assuming even that it was Kwitchurbeliakin that was

5     running Thunderbird Lanes, what specifically can you testify

6     to as to how it is not being competently run?

7          A.   Again, the condition of the building, the loss of

8     business, which has been significant --

9          Q.   And -- and may I stop you at that point.

10         A.   Sure.

11         Q.   What personal knowledge do you have as to the loss

12    of business?

13         A.   What personal knowledge do I have?  Up until this

14    year I bowled there for thirty years myself.  And that's a

15    fairly tight knit group of people and you hear it.  I mean,

16    it's obvious the leagues have left.   My -- the league that

17    I bowl in left.  So, I'm...  I certainly have the personal

18    knowledge these leagues have left.  As well as the youth

19    bowlers have also left and moved to, you know, the...

20    They've taken them to Casey's Lanes, which is the other

21    bowling center in LaPorte.

22         Q.   Okay.  So, you're talking about a loss of business.

23    Is that correct?

24         A.   Yes.

25         Q.   What, specifically, can you testify to as to what

16

```
 1    actions Kwitchurbeliakin has taken that result in the loss of

 2    business?

 3         A.   I can tell you firsthand that on several occasions

 4    Mr. Apfel has told people if they don't like the way he's

 5    doing things go to Casey's.  He has said that.  He told me

 6    that.

 7         Q.   Who has he said that to?

 8         A.   To me.  I bowled with Mr. Apfel until a couple of

 9    years ago.  We were on the same team.

10         Q.   And when was the last time you had that

11    conversation?

12         A.   With Mr. Apfel?

13         Q.   Yes.

14         A.   One over a year ago.

15         Q.   Now, even assuming that he said that to be true --

16         A.   Well, he did.

17         Q.   -- how does that relate to the management of

18    Kwitchurbeliakin?

19         A.   I think it speaks very well to his, to his

20    knowledge of what it takes to make a business work.  You

21    don't tell people to leave if you want them to be there and

22    be your customers.

23         Q.   Okay.  Other than that, do you have any other

24    personal knowledge as to the competence level of Mr. Apfel --

25         A.   The payment --
```

17

```
 1              Q.   -- in running --

 2              A.   -- performance.

 3              Q.   I'm sorry.  Let me finish my question.

 4              A.   Okay.

 5              Q.   In --

 6              A    I thought you were done.

 7              Q.   In running Kwitchurbeliakin?

 8              A.   The payment performance or the lack thereof.

 9              Q.   Okay.

10              A.   I think that speaks strongly.

11              Q.   Anything else?

12              A.   I think that's enough.

13              Q.   You also testified earlier on Direct that

14     Kwitchurbeliakin isn't managed correctly.  Could you test...

15     May I ask you what specific knowledge do you have that the

16     Debtor, Kwitchurbeliakin, isn't being managed correctly,

17     other than the nonpayment towards the loan to LaPorte Savings

18     Bank?

19              A.   The loss of customers as well as the lack of

20     payments.  The lack of...  The lack of following up where

21     you've tried numerous times to contact him to resolve this

22     short of this action and he has never responded to anything.

23     I even stopped out there personally one time to try to talk

24     to him.  He would not come out of his office.  Those are not

25     responsible actions of a manager.  I've dealt with business
```

18

1    people for thirty-eight years and the responsible person does

2    not act that way.

3        Q.   Do you have any other specific knowledge as to how

4    the Debtor, Kwitchurbeliakin, has not been managed correctly?

5        A.   Not at this time.

6        Q.   Do you have any experience relating to the

7    management of a bowling business other than the fact that

8    you're a member of a bowling league?

9        A.   As I mentioned, we've -- we've had the loan on this

10   same facility for approximately fifteen years.

11       Q.   Okay.  But you're not answering my question

12   directly.

13       A.   I thought that was your question.  I'm sorry.

14       Q.   Okay.  Do you have any specific experience relating

15   to the management and operation of a bowling business?

16       A.   I've experience with the management of a number of

17   businesses, because I've been in the commercial lending field

18   for this length, for the same length of time I've been at the

19   Bank.  So, I've -- I see many different business owners.  And

20   it doesn't take long to recognize if someone has ability or

21   not to manage a business.

22       Q.   Have you ever personally managed or operated a

23   bowling business?

24       A.   No.  I have...  I have not.

25       Q.   And do you know all the intricacies that are

19

1      involved in managing and operating a bowling business?

2           A.   Every intra-...  Probably not every one.  I don't

3      think I need to to determine that it's not being handled

4      correctly.

5           Q.   Has your bank extended loans to other business

6      entities...  Well, let me strike the question, because I

7      believe you testified that you, you had.  I'm sorry.

8                Are there any other buildings or structures

9      that are being operated as bowling centers to which LaPorte

10     Savings Bank has granted a loan?

11          A.   Not at this time.

12          Q.   Okay.  So, when you're talking about previous

13     management, it only relates to this one particular building.

14     Is that correct?

15          A.   Oh, so, you're talking about if...  A bowling

16     centers?

17          Q.   Yes.

18          A.   Yes.

19          Q.   You also testified on Direct that you do not

20     believe the business can be run successfully.  What specific

21     knowledge do you have that will lead you to come to that --

22          A.   The --

23          Q.   -- conclusion.

24          A.   The number of bowlers that have left there

25     represent a significant amount of revenue and when you lose

1    that kind of business, the debt service coverage goes away.

2         Q.   Well, do you have any specific knowledge as to how

3    much revenue that Arnie's...  I'm sorry.  That

4    Kwitchurbeliakin, this bowling --

5         A.   Well --

6         Q.   -- center is generating?

7         A.   Unfortunately, I do not, because Mr. Apfel has

8    failed to provide us with the financial statements his note

9    calls for us to have every year.

10        Q.   So, you don't know whether it's generating....

11        A.   He has failed to provide us with --

12        Q.   Let me finish my question.

13        A.   -- the numbers.  He has failed to provide us with

14   the numbers as the contract calls for.

15        Q.   Do you have any personal knowledge as to how much

16   revenue Kwitchurbeliakin has generated in the last year?

17        A.   No.

18        Q.   And I mean for the year 2009.

19        A.   No.  None.

20        Q.   Do you have any personal knowledge as to how much

21   revenue the bowling center has generated since 2008?

22        A.   Again, he has not provided us with the numbers.

23        Q.   Do you have any personal knowledge as to how many

24   patrons the bowling center has right now?

25        A.   I was told --

1          Q.   Ah...

2          A.   -- that it was around...  If you asking me, that's

3     what I'm going to have to tell you.

4          Q.   Do you have --

5          A.   Do you want me to answer it?

6          Q.   -- any personal knowledge?

7          A.   No.

8          Q.   You testified earlier at one time there were nine

9     leagues operating out of this bowling center?

10         A.   No.  No, that's not what I said.

11         Q.   Oh, I'm sorry.  What did you say?

12         A.   I said nine leagues have left.

13         Q.   Oh.  Nine leagues have left.  Okay.  So, at its

14    high point how many leagues were operating out of this

15    bowling center and when?

16         A.   I don't think I -- I don't have the information off

17    the top of my head.  I think...  I think someone else could

18    answer that question, though, that's here.

19         MS. PARR:  I have no other questions.  Thank you.

20         THE COURT:  Mr. Edgar, does the U.S. Trustee's Office

21    have any questions?

22         MR. EDGAR:  Just briefly, Your Honor.

23

24    CROSS-EXAMINATION BY MR. EDGAR:

25         Q.   Sir, my name is Alex Edgar.  I'm with the U.S.

1    Trustee's Office and I just have a couple of follow-up

2    questions.

3              Did I understand you to say that you were the

4    loan officer at the time the loan was made to --

5         A.   Yes, that's correct.

6         Q.   -- to Kwitchurbeliakin?

7         A.   Yes, that's correct.

8         Q.   Okay.  Now, so, you're familiar with all the loan

9    documents, the mortgage, the loan application form, the --

10        A.   Yes.

11        Q.   -- promissory notes and so forth?

12        A.   Correct.

13        Q.   Did I understand you correctly to say that the Bank

14   wasn't aware of this lease entered into between

15   Kwitchurbeliakin and Arnie's?

16        A.   That's correct.

17        Q.   Well, that -- that loan went down back in May of

18   '05.  Correct?

19        A.   Uh-huh.

20        Q.   And when did you first become aware that that lease

21   agreement had been entered into?

22        A.   I think when it became in -- when it became an

23   issue in this matter.

24        Q.   Well, that would have been in -- within how many

25   months of today?

23

1          A.    Oh...  Last two months?  Month-and-a-half?  I don't
2    know.
3          Q.    The last two months.
4          A.    Something like that.  I don't know.
5          Q.    Did either of the principals of Kwitchurbeliakin
6    ever approach the Bank and notify you that this is something
7    that they wanted to enter into; that is, a lease between
8    themselves as Kwitchurbeliakin and Arnie's?
9          A.    I do not recall that ever happening.
10          Q.    And I was a little unclear.  Is this the only
11    bowling center, bowling alley in town?
12          A.    No, it is not.  There is...  There is another.
13    There's another center.
14          Q.    And what was the name of the other?
15          A.    Casey's.
16          Q.    Casey's.  All right.
17          A.    Yeah.
18          MR. EDGAR:  All right.  Thank you.  That's all I have,
19    Your Honor.
20          THE COURT:  Any Redirect?
21          MR. PHILLIPS:  Thank you, Your Honor.
22
23    REDIRECT EXAMINATION BY MR. PHILLIPS:
24          Q.    You were asked on Cross-Examination, Mr. Klosinski,
25    about the dual existence between Arnie's and

1    Kwitchurbeliakin.  And you've told us now that you've...  The
2    Bank has actually known about this dual existence for the
3    last two months, even though the loan's been in existence for
4    almost five years now.  Is this the kind of information that
5    you would have learned about had the financial documents been
6    provided to you by the Debtor?
7          A.    Well, if...  At the time the loan was made we would
8    have, since it's the same individuals, we probably would have
9    requested a guarantee from Arnie's on the loan at the time
10   the, you know, at the time the loan was made.
11         Q.    So, the --
12         A.    Would be a typical --
13         Q.    -- the failure --
14         A.    -- procedure.
15         Q.    The failure to disclose the existence of this dual
16   existence could have affected the loan to begin with.
17         A.    Conceivably.
18         Q.    All right.  Now, not only did they not disclose the
19   fact of this dual existence and the fact of this lease, did
20   they also fail to disclose to you the existence of the
21   nonpayment of the lease payments?
22         A.    That was...  I...  That...  I knew nothing of that.
23         Q.    Okay.  Now, you indicated on Cross-Examination that
24   you're familiar with the, this operation before
25   Kwitchurbeliakin and Arnie's took it over?

25

1          A.   Yes.  Correct.

2          Q.   Without getting into the actual numbers, was this

3     or was this not a profitable operation for the previous

4     owners

5          A.   Yes, it was a profitable operation.

6          Q.   Can you quantify that a little bit for us?  Give us

7     some ex- -- what you mean by that?

8          A.   Well, payments are made on time.  Receipts,

9     financials in a timely manner.  They showed the ability to

10    service their debt and as well as leave a decent profit for

11    the owners as well.  I would call that a successful

12    operation.

13         Q.   And that was for how many years?

14         A.   At least fifteen.

15         Q.   Before we came to...  Before this bankruptcy case

16    was filed, this -- there was a mortgage foreclosure, a

17    foreclosure action pending in State court; is that correct?

18         A.   That's correct.

19         Q.   Direct your attention to Creditor's Exhibit 9.  In

20    that State Court proceeding on the same facts that you've

21    just told us, was there a Receiver appointed for --

22         A.   Yes, there was.

23         Q.   -- this business?

24         A.   Yes, there was.

25         Q.   And who was the Receiver that was appointed?

1          A.    Larry Burchiel.

2          Q.    And who is Mr. Burchiel?

3          A.    Mr. Burchiel is the previous owner of Thunderbird

4    Lanes.  And he --

5          Q.    He's in the Court, courtroom here today?

6          A.    Yes, he is.

7          Q.    Okay.  And is Mr. Burchiel the person you would

8    like to see appointed as Trustee in this case?

9          A.    Yes, he is.

10         Q.    Why?

11         A.    He has demonstrated the ability to make this

12   business successful.

13         Q.    And have --

14         A.    He is a -- he's a...  He has a good reputation in

15   the, in the community and he, again, he's demonstrated his

16   ability to run a facility of this type.

17         Q.    And has Mr. Burchiel agreed to do that?

18         A.    Yes, he has.

19         MR. EDGAR:  Thank you.  No further questions.

20         THE COURT:  Miss Parr, any more questions?

21         MS. PARR:  Couple more questions.

22

23   RE-CROSS-EXAMINATION BY MS. PARR:

24         Q.    Mr. Kosinski(phonetic), are you aware that Arnie's

25   Bowling and Recreation Center has had a business account at

27

1    LaPorte Savings Bank since 2005?

2          A.    I became aware of that after the loan was made.

3    Mr. Apfel told me that he had opened that as an operating

4    account.  I knew nothing of the structure of that, of that

5    business or that incorporation.

6          Q.    And at what time did Mr. Apfel tell you that?

7          A.    It was some...  It was at least a year after the --

8    after the loan was closed.

9          Q.    You testified earlier that you bowled at this

10    bowling center?

11          A.    Yes, I did.

12          Q.    Had you ever observed that the business license was

13    in the name of Arnie's Bowling --

14          A.    I don't.

15          Q.    -- and Recreation Center?

16          A.    No, but...  No.  Definitely not.

17          Q.    Were you aware that the liquor license under which

18    alcoholic beverages were being sold at the bowling center

19    were under the name of Arnie's?

20          A.    No.

21          MS. PARR:  I have no other questions.

22          THE COURT:  Mr. --

23          MR. PHILLIPS:  Nothing further.

24          MR. EDGAR:  Nothing further.

25          THE COURT:  Okay.  Mr. Klosinski, you kind of rushed

28

```
 1     over your spelling of your name.  Let me see if I've got this
 2     right.  Is it K-l-o-s-i-n-s-k-i?
 3          MR. KLOSINSKI:  That is correct.
 4          THE COURT:  And your first name again?
 5          MR. KLOSINSKI:  Russell.  Two --
 6          THE COURT:  Russell.
 7          MR. KLOSINSKI:  -- Ss and two Ls.
 8          THE COURT:  Okay.  Thank you.  You may step down.
 9          MR. KLOSINSKI:  Thank you.
10          MR. PHILLIPS:  Your Honor, I'd like to have Mr. Burchiel
11     testify, please.
12     (Whereupon, Deponent sworn in by the Courtroom Deputy.)
13          COURTROOM DEPUTY:  Please take the stand.
14
15     LARRY BURCHIEL, having been first duly sworn to tell the
16     whole truth, was examined and testified as follows:
17
18     DIRECT EXAMINATION BY MR. PHILLIPS:
19          Q.   Tell us your name and spell your last name, please?
20          A.   Larry Roth Burchiel.  B-u-r-c-h-i-e-l.
21          Q.   And, Mr. Burchiel, what is your relationship with
22     the bowling alley we've been talking about here today?
23          A.   Well, I ran it for about twenty-five years prior to
24     2000 and, then, my wife and I purchased it in 2000 and owned
25     it until 2005 when we sold it.
```

29

1        Q.   And have you recently...  Were you recently

2    appointed by LaPorte Superior Court as a Receiver to operate

3    the business?

4        A.   Yes.  I was in there two weeks.

5        Q.   Okay.  Now, tell us your observations about how

6    this business has been managed between the time that you left

7    it and the time you came back as Receiver.

8        A.   Well, there...  There were some problems.  There's

9    no question about it.  We...  When we went in there, we

10   replaced lights, re-done this, re-done that.  And it's been

11   -- been let go.  The, the...  The main problem is the roof as

12   far as the building goes.  But it hasn't been run correctly

13   management-wise either.

14       Q.   We had some testimony earlier about the loss of

15   bowling league.  Can you tell us at the peak how many bowling

16   leagues existed at that facility?

17       A.   Well, yeah.  I...  We were just back there figuring

18   that.  And when we left we had twelve hundred and sixty...

19   Now, this is approximately within a handful.  Twelve hundred

20   and sixty-seven league bowlers per week.  And when I went in

21   there a couple of weeks ago, I, I believe that there's

22   approximately five hundred and twenty league bowlers left.

23   That's...  That's within a handful.

24       Q.   Okay.

25       A.   I mean --

                              30

1        Q.    Now --

2        A.    -- it's not....

3        Q.    During the time that your -- that you and your wife

4    owned the bowling alley in addition to your management

5    there --

6        A.    Uh-huh.

7        Q.    -- but just...  I want to focus on a time that you

8    owned it.

9        A.    Uh-huh.

10        Q.    Was it a profitable operation in that you could pay

11    off the debts associated with the business and still generate

12    a profit --

13        A.    Oh, definitely.

14        Q.    -- for you?

15        A.    Yeah.  Definitely.

16        Q.    Can you explain a little bit about that?

17        A.    Well, it, it allowed us, in the five years that we

18    owned it, to retire at fifty-five, so...  We done very well

19    with it.  It was a very good business.

20        Q.    And if this business is managed competently, can it

21    generate that kind of profit?

22        A.    If it...  Well, it will be tough to bring it back.

23    I mean, these, these league bowlers are gone.  So, it's going

24    to be tough to bring them back, but it will take a...  It

25    will take some work.  That's for sure.

                                31

1          Q.    In addition to observing the deterioration of the,

2     of the building and the grounds when you went back --

3          A.    Uh-huh.

4          Q.    -- for the two weeks that you served as Receiver --

5          A.    Right.

6          Q.    -- you also noticed that there was this more than a

7     fifty percent fall-off on league bowlers.  What does that

8     means in terms of generation of income?

9          A.    Well, your, your league bowlers are your, are you

10    life blood of the, of the bowling center.  If you...  If you

11    don't have your league play, to me, you don't...  I mean,

12    you're, you're...  You're going to struggle.  There's no

13    question about it.  When you...  When you get your leagues

14    going in the first of September, you pretty well can tell for

15    the next eight months pretty much what your income is going

16    to be.  You, you know every day you're going to have pretty

17    much...  Well, what you're going to make that day.  I mean,

18    outside of in your bar or whatever.  But you're going to know

19    weekly what your income is going to be.

20         Q.    In the twenty-five years that you've been

21    associated with -- and meant by virtue of managing and/or

22    owning -- this bowling alley, have you ever seen or

23    experienced such a precipitous drop in league membership?

24         A.    I can't remember in the time that I've been there

25    of a league leaving.  I can...  I...  In the thirty years

32

1    that I've been there, I can never...  Now, there's bowlers,

2    of course, that will go to a different center or come, you

3    know, whatever.  But I've never experienced a league

4    themselves in the entirety just going to a different center.

5    I've never....

6        Q.   Do you have an explanation as to why a league would

7    leave a bowling alley such as Thunderbird?

8        A.   They, the bowlers of Thunderbird have been loyal to

9    that center for years and years and years.  And it has to be

10   mismanagement.  I know they've been told before if there's

11   something you don't like, there's the door; you are welcome

12   to leave or...  Or here's a couple dollars.  You can go to

13   the other center and bowl.  I know they've been told that.

14   I've, I've...  I've been on the street and had people tell me

15   that they've said, you know, here's, here's two dollars; go

16   to the other center and bowl if you don't like it.  So....

17       MR. PHILLIPS:  Thank you, Mr. Burchiel.  Nothing

18   further, Your Honor.

19       THE COURT:  Cross-Exam, Miss Parr?

20

21   CROSS-EXAMINATION BY MS. PARR:

22       Q.   Mr. Burchiel, for which period, time period did you

23   act as Receiver on behalf of LaPorte Savings Bank?

24       A.   I'm sorry.  What?

25       Q.   For what time period did you act as Receiver for

```
 1          LaPorte Savings Bank?

 2               A.   I believe it was the 25th of February for two

 3          weeks.

 4               Q.   And that was the beginning date?

 5               A.   The 25th of February.

 6               Q.   Okay.  Of 2010?

 7               A.   Of this year.  Uh-huh.  Yeah.

 8               Q.   Okay.  And you testified on Direct that you

 9          observed some problems.  Is that correct?

10               A.   Yes.  Uh-huh.  Yes.

11               Q.   You said that some lights needed to be

12          replacing(sic)?

13               A.   Well, we done quite a few things that are...  There

14          are many more things to be done.

15               Q.   Okay.  But I direct her...  On Direct Examination

16          you said we did this and we did that.  What exactly did you

17          do?

18               A.   We...  It would be the north side of the building.

19          The day that I took over I was walking down talking to the

20          league and it was a women's league.  And there on the first,

21          first part of the lanes toward the north.  And they

22          complained that there's no lights on this, on the building at

23          all.  And...  And there's two dusk-to-dawn lights.  Those

24          were out.  We had Mitchell(phonetic) come and, and repair

25          those.  And there's about three or four lights on the side of
```

34

1    the building that were out and we replaced those.  And the,

2    the ladies don't like getting out of their cars or going to

3    their cars in the dark.

4        Q.   Okay.  Anything else that you did?

5        A.   Minor things.  When we owned the building one of

6    the main things they said was we'd listen to them at their

7    meetings and stuff and they'd say, you know, they would like

8    paper towels in the bathroom rather than the hand dryers.

9    So, we put little baskets with, with paper towels in there so

10   the league bowlers could use the paper towels.  Now, when the

11   open bowlers or the go bowlers or whatever would come in, we

12   would take them out because they are -- tend to be a little

13   more, shall we say, rowdy or whatever and we didn't want

14   those, you know, misplaced or whatever.  But the league

15   bowlers really appreciated the towels.

16       Q.   Okay.  Prior to you placing the hand towels in the

17   bathrooms, were there hand dryers?

18       A.   Yeah.  There's hand dryers, yeah.

19       Q.   Were they operational?

20       A.   Uh-huh.  Yeah.  Yeah.  They just would rather dry

21   their hands with a paper towel then.

22       Q.   Anything else that you did?

23       A.   Well, we...  We instrumented(sic) on the change of

24   shifts in order to -- when the...  When the daytime bartender

25   quit, we went in and done a reading of the register and she

35

1       counted her money and the next, the next -- the bartender

2       would start with a new register and we would have a checks

3       and balances from one shift to another.  Previously, one --

4       one bartender would just take over the drawer and go and if

5       there was a problem or shortage you wouldn't know if it was

6       from the day shift or from the night shift, so....

7            Q.   Is that un- --

8            A.   We had more --

9            Q.   I'm sorry.

10           A.   -- more checks and balances.

11           Q.   Is that uncommon for that type of cash register

12      exchange to take place or cash register drawer?

13           A.   Well, there's only one drawer, so you have to exit

14      out and take a reading and count the money and, then, put a

15      fresh set of money in there for the next --

16           Q.   Okay.  Now, was the --

17           A.   The ideal way would have a couple regis- -- you

18      know, a couple drawers to work out of, but there's only one

19      drawer; so, that's the way we have to do it.

20           Q.   Okay.  Now, that's the way that you opted to do it.

21      Is that correct?

22           A.   That is correct.  Yes.  Uh-huh.

23           Q.   But are there other ways that it can be done?

24           A.   Well, previously there was just -- they just

25      weren't check -- they weren't...  You know, they were just

36

1    going from one bartender to the next or -- without a checks

2    and balances, so...  I don't know what other way there would

3    be.  Like I said, if you had a -- if you had the cash

4    register with a couple of drawers, one could use one and one

5    could use the other, but there isn't that kind of....

6        Q.   Okay.  Is there anything else that you did during

7    that two-week time period that you were acting as Receiver?

8        A.   Well, we basically cleaned up the place.  The

9    parking lot was, was a mess.  My wife and I personally swept

10   the cigarette butts out in front of the entryway.  As you

11   walked in, there must have been a, a snow shovel full of

12   cigarette butts set out there.  And it's just something that

13   we always watched when we owned it and tried to keep it clean

14   and....

15       Q.   Okay.  So --

16       A.   Basic -- basically go around and talk to the

17   bowlers and, you know, get their opinions, you know, get...

18   You know.  They'll tell you what, you know, what they want to

19   see and what they want to happen.  You know.

20       Q.   Okay.  Now, is it your testimony that by virtue of

21   the fact that there needed to be some lights to be replaced

22   on the inside and some lights to be replaced on the outside

23   and that the parking lot needed cleaning that these were acts

24   of incompetence and mismanagement on the part of Mr. Apfel?

25       A.   Yeah.  One other thing.  When we got in there the

37

```
 1      Health Department had a slip and there were a couple of

 2      things.  One, the refrigerators had a magnet around, you

 3      know, to seal, to refrigerate.  It was almost completely

 4      disintegrated and, and the cook was telling me that the, the

 5      stuff inside seemed to be freezing and thawing and it not

 6      working right.  So, I went and brought a new freezer and put

 7      in there and...  The filters in -- above the grill were also

 8      on that list of -- from the Health Department.  We had those

 9      cleaned.  Just basically trying to make the place look more

10      appealing.

11          Q.  Did you happen to bring with you a copy of the slip

12      from the Health Department?

13          A.  I'm sorry.

14          Q.  Did you bring with you a copy of the slip or the

15      slip from the Health Department?

16          A.  No, I didn't.  No.  No.

17          Q.  And, so, what were the violations, if you will,

18      that the Health Department found?

19          A.  Those are the two that I can remember that we did.

20          Q.  I'm sorry.  If you...  If you could repeat those

21      again?  They were what?

22          A.  The filters above the grill were, were not cleaned.

23      So, we had the -- had those cleaned.  And they were

24      complaining about that freezer with the gasket disintegrated,

25      was in very poor condition.  So we just brought a new
```

38

1    freezer.

2         Q.   Other than the two weeks that you were acting as

3    Receiver on behalf of LaPorte, have you been in the bowling

4    business since 2005?

5         A.   No, not since 2005, no.

6         Q.   But have you actively kept up with the industry as

7    far as the latest happenings in the bowling industry?

8         A.   Well, I, I've... Am aware of the... The bowling

9    has  been my life; so, yeah, I would say I'd pretty well

10   know.

11        Q.   Okay.  And is the bowling industry subject to the

12   recession or a recession?

13        A.   Well, I would say the... I would say the recession

14   definitely has affected him some.  But the ninety percent of

15   his problem is he's lost the bowlers to the other center.

16   They haven't... They haven't quit bowling.  They've gone to

17   the other center.  By, by showing the numbers.  More than

18   half -- more than half of his --

19        Q.   And what numbers are you --

20        A.   -- league bowlers are gone.

21        Q.   And... I'm sorry.  Excuse me.  But what numbers

22   are you about to make reference to?

23        A.   To the league bowlers that we had when we were

24   there and what he has presently.

25        Q.   Okay.  That, I believe was your testimony that at

1    the time that you operated the business in 2005 you had,

2    what, about twelve thou- -- I'm sorry -- twelve hundred

3    sixty-seven bowlers?

4         A.   Within a handful, yeah.  Yeah.  Yeah.

5         Q.   And that....

6         A.   He has now approximately five hundred and twenty,

7    with -- within a handful.

8         Q.   Okay.  Besides this particular bowling center, have

9    you made any personal observations about the number of league

10   bowlers that bowl at other bowling centers?

11        A.   The only one that I'm -- I'm familiar with is the

12   other one in town.  And it used to be that they had the

13   openings of league bowlers and Thunderbird was always full.

14   Now, like I say, all you have to do to find all the league

15   bowlers that have left is to go over to the other center and

16   they're over there.

17        Q.   And how many league bowlers does this other center

18   have?

19        A.   (Whereupon, no audible response.)

20        Q.   If you know.

21        A.   The exact number?  Oh, I can...  I can --

22        Q.   First of all, do you know?

23        A.   I can tell you what they have, yeah.

24        Q.   Okay.

25        A.   You mean, each night what they have?  Yeah, I can't

40

1     tell you the total number off the top of my head, but if you

2     want to write it down, I'll tell you what they are.

3          Q.   Okay.  Then go ahead.

4          A.   Or pretty close.  Pretty close.

5          Q.   Okay.  Go ahead.

6          A.   They have, let's see, a hundred and ten bowlers on

7     Monday night.  A hundred and ten bowl- -- a hundred and

8     twenty bowlers on Tuesday night.  Wednesday, I'm...  I think

9     they have, like, eighty bowlers.  Thursday they have a

10    hundred and twenty.  They have a...  They have a Thursday

11    morning league, but I'm not -- I'm not sure what they have in

12    the morning.  Friday they don't have much.  Saturday they

13    have the kids that were at Thunderbird.  I think they have...

14    I want to say a hundred and eighty kids on Saturday.  That's

15    what I heard.

16         Q.   Now, do you count those as league bowlers?

17         A.   Yes, the kids on Saturday.  League bowlers.

18         Q.   Okay.

19         A.   Yes.

20         Q.   And did you count the Saturday kid -- league

21    bowlers at the, at the Arnie's Bowling?

22         A.   Yes.  Yes.  Uh-huh.  Yeah.

23         Q.   Okay.  I'm sorry.  Go ahead.  You were --

24         A.   I...  I figured he...  On Saturday night they have

25    ninety-six bowlers.

41

1        Q.   Who we talking about now?

2        A.   At Casey's.

3        Q.   Okay.

4        A.   And ninety-six on Sunday.

5        Q.   But how can you be so precise with your numbers?

6        A.   Well, I...  I pretty well stay up with bowling in

7  town.

8        Q.   Okay.  And are you --

9        A.   I mean, I...  And I used to -- I used to bowl.  I

10  didn't bowl this year, but I used to bowl.

11        Q.   And are you personally going in to this other

12  bowling center and making a count of the number of league

13  bowlers that they have?

14        A.   No, but I -- I'm told from other people what they

15  have and when they bowl and I know --

16        Q.   Okay.  So, this --

17        A.   It's within a handful.  It's not an exact number,

18  but it's very close.

19        Q.   So, this information that you just -- you're

20  testifying to is information that has been given to you by

21  others.  Is that correct?

22        A.   Well, I personally believe that that is true.

23        Q.   Okay.  But you don't have any --

24        A.   I mean, they're, they're...  They're in the paper.

25  The leagues are in the paper or this or that.  I'd...  I talk

1    to other bowlers.  I know when they bowl.  I know how many's

2    in the league.  I keep...  I keep up on that --

3        Q.   Okay.

4        A.   -- that kind of stuff.

5        Q.   But you personally do not really know the numbers

6    that are coming into this other bowling center.  Is that

7    correct?

8        A.   Do I personally go over there and count them?

9        Q.   Yes.

10       A.   No.  I don't.  No, no.  But I do believe that to be

11   pretty accurate.

12       Q.   Okay.  Mr. Burchiel?

13       A.   Yes.

14       Q.   Prior to you selling the business in 2005, did this

15   building have roofing problems even then?

16       A.   It was starting to have...  We were starting to

17   notice a prob-....  Not, not like what he has now, but, yes,

18   it was a...  In certain areas there were starting to be a

19   problem.

20       Q.   Okay.

21       A.   But we would get somebody up there to...  Problem

22   is the front of it is a -- is a flat roof and the flat roof

23   is a rubber roof and some of the seams would come loose.

24   We'd have to get somebody up there to glue the seams back

25   together.

1          Q.   Mr. Burchiel, is it your testimony that based upon

2     the things that you did during that two-week period that you

3     were acting as Receiver that you came to the conclusion that

4     the bus- -- the bowling center was being mismanaged?

5          A.   Well, I wouldn't say it was a -- it was a

6     conclusion of the two weeks that I was there.  I would say it

7     was as much or more what I've heard from going around town,

8     the bowlers telling me --

9          Q.   Okay.

10         A.   -- what's going on there.

11         Q.   Mr. Burchiel, let's just talk about the two weeks

12    that you were there.

13         A.   Okay.  Uh-huh.

14         Q.   Because that's the only two weeks that you have

15    actual personal knowledge as to the management of this

16    bowling center.  Is that correct?

17         A.   No, I -- no, I don't believe it is correct.  No.

18    No.  I....

19         Q.   Well, let's just talk about these two weeks that --

20         A.   Oh, okay.

21         Q.   -- you were there.

22         A.   All right.

23         Q.   Now, based upon your prior testimony as to the

24    things that you did when you were there as Receiver --

25         A.   Uh-huh.

                                                              44

1        Q.   -- that you came to the conclusion that the

2    business was being mismanaged?

3        A.   Well, it's not over the things that I tried to

4    repair.  It's, it's things that that, that had been done

5    previous to when I got in there.  The, the way the place was

6    managed.  It's not just the condition of the building.  It's

7    more the, the position of the build- -- the place; the way it

8    was managed.

9        Q.   Okay.  And how...  What personal knowledge do you

10   have as to the manner in which it was being managed?

11       A.   Would you repeat that, please?

12       Q.   What personal knowledge do you have as to the

13   manner in which the business was being managed prior to you

14   becoming Receiver?

15       A.   Well, the only information I have was what I've

16   received from the bowlers.  I, I don't...  I....

17       Q.   Okay.  So, you have no personal knowledge.  Is that

18   correct?

19       A.   Yeah.  I have the knowledge of the bowlers that

20   have told me that --

21       Q.   Okay.

22       A.   -- how it was managed.  Yes.

23       MS. PARR:  I have no other questions.

24       THE COURT:  Mr. Edgar?

25       MR. EDGAR:  No questions.

45

1          THE COURT:  Any Redirect?

2          MR. PHILLIPS:  Very very brief, Your Honor.

3

4    REDIRECT EXAMINATION BY MR. PHILLIPS:

5          Q.   Mr. Burchiel, at the time you sold the business to

6    Mr. Apfel --

7          A.   Uh-huh.

8          Q.   -- was this business able to generate enough income

9    to pay a nine thousand dollar a month mortgage payment?

10         A.   Oh, yes.  Yeah.

11         Q.   And at the time you sold the business to Mr. Apfel,

12   was the business able to, if necessary, make a rent payment

13   of thirteen thousand dollars a month?

14         A.   Well, I believe it was, yes.  Yes.

15         Q.   Now, you described in rather great detail some of

16   the aspects of the mismanagement and the incompetence that

17   you saw when you came back in and that you learned through,

18   through other sources.  Quick question for you, sir.  But for

19   that mismanagement and but for that incompetence, could this

20   business have still generated a profit when you sold it to

21   Mr. Apfel?

22         A.   I'm sorry.  Would you repeat that, please?

23         Q.   Yep.  But for the incompetence that you've

24   described and but for the mismanagement that you described,

25   could this business have still made a profit when you sold it

46

1    to Mr. Apfel?

2        A.    Well, when I sold it, yes, it could make a profit.

3    Yes, definitely.

4        Q.    Because back at that time you turned -- when you

5    turned it over to him, there were twelve hundred and sixty-

6    seven, give or take a handful of --

7        A.    Right.

8        Q.    -- league bowlers.

9        A.    Right.  Right.  Per week.  Right.

10       Q.    Per week.

11       A.    Right.  Right.

12       Q.    Okay.  And since then it's been reduced to five

13   twenty --

14       A.    Well, when I got there, yeah, approximately five

15   hundred and twenty.  Right.

16       Q.    And if one -- if a person was going to come back

17   into that business, that -- back into that bowling center and

18   try to resurrect it and restore it to its former condition,

19   would Mr. Apfel be the person to run it?

20       A.    I don't believe so.  No.

21       Q.    All right.  Thank you.

22       A.    I don't believe so.

23       MR. PHILLIPS:  Thank you.

24       THE COURT:  Miss Parr, any more Cross-Exam?

25       MS. PARR:  No.

47

```
 1              THE COURT:  All right.  You may step down, Mr. Burchiel.

 2      Thank you.

 3              MR. PHILLIPS:  Rest, Your Honor.

 4              THE COURT:  Okay.  Miss Parr?

 5              MS. PARR:  Your Honor, at this time I'd like to call

 6      Todd Apfel to the witness stand.

 7              THE COURT:  Okay.  Mr. Apfel, if you'd come over here

 8      and take the oath, please.

 9      (Whereupon, Deponent sworn in by the Courtroom Deputy.)

10      COURTROOM DEPUTY:  Please take the stand.

11

12      TODD APFEL, having been first duly sworn to tell the whole

13      truth, was examined and testified as follows:

14

15      DIRECT EXAMINATION BY MS. PARR:

16          Q.   Mr. Apfel, could you please state your position

17      with Kwitchurbeliakin, LLC?

18          A.   Vice President.

19          Q.   Where was this entity organized?

20          A.   In Michigan.  State of Michigan.

21          Q.   And, then, did you subsequently have it certified

22      in the State of Indiana?

23          A.   Yes, we did.

24          Q.   Do you have written or prepared Articles of

25      Organization --
```

1          A.    Yes, we --

2          Q.    -- for Kwitchurbeliakin?

3          A.    Yes, we do.

4          Q.    And do you also have...  I'm sorry.  Your Articles

5     of Organization.  Is that correct?

6          A.    Right.

7          Q.    Okay.

8     (Whereupon, pause in the proceeding.)

9          MS. PARR:  Q.  I'd like to hand you what has been marked

10    as Plaintiff's...  I'm sorry.  Debtor's Exhibit C.  Okay.

11    Could you identify the first page of that document?

12         A.    It's the Certificate of Authority for

13    Kwitchurbeliakin, LLC.

14         Q.    Okay.

15         A.    It's for the State of Indiana.

16         Q.    And, then, can you identify the second doc- --

17    second page of that document?

18         A.    It's the filing endorsement for the Articles of

19    Organization for Kwitchurbeliakin for the State of Michigan.

20         Q.    And, then, if you look at the third page?  Can you

21    identify that document?

22         A.    It's the Articles of Organization for

23    Kwitchurbeliakin, LLC.

24         Q.    And, then, on the fifth page, if -- if you'll flip

25    through the fifth page of that document?

49

1          A.    That's the operating agreement of Kwitchurbeliakin,

2     LLC.

3          MS. PARR:  Okay.  Your Honor, prior to this hearing

4     beginning, beginning, the parties agreed to the, stipulated

5     to the authenticity --

6          THE COURT:  Right.

7          MS. PARR:  -- of these documents?

8          THE COURT:  And to the admissibility, I believe.

9          MS. PARR:  Okay.  And the admissibility?

10         MR. PHILLIPS:  That's correct.

11         MS. PARR:  Is that correct?

12         THE COURT:  Yep.

13         MS. PARR:  Okay.

14         Q.    How many members are there to the LLC,

15     Kwitchurbeliakin?

16         A.    Two.

17         Q.    And the names of those members?

18         A.    Myself, Todd Apfel, and Luise Lesser.

19         Q.    And was this company organized...  What was the

20     purpose for the organization of this company?

21         A.    To purchase a bowling center.  Originally,

22     Michigan, to purchase one up there that fell through.  So,

23     when we bought this one, that's why we had to transfer it to

24     Indiana, have it approved by the State of Indiana.

25         Q.    Okay.  And did you subsequently apply for a loan at

50

1     LaPorte Savings Bank?

2          A.   Yes, we did.

3          Q.   It was a mortgage loan?

4          A.   Yes.

5          Q.   And you also subsequently applied for a second

6     mortgage; is that correct?

7          A.   You mean a second loan through them?

8          Q.   Yes.

9          A.   Yes.

10         Q.   Okay.  I'm sorry.  Were there a particular officer

11    with the Bank with whom you had your negotiations?

12         A.   LaPorte.  It was Mr. Klosinski.

13         Q.   Okay.  And from whom did you purchase the bowling

14    alley?

15         A.   Larry and Marge Burchiel.

16         Q.   What was the purchase price?

17         A.   One point five million.

18         Q.   And how much was the loan that you obtained from

19    LaPorte Savings?

20         A.   We had to do two loans, because the SBA loan did

21    not...  I don't know.  So, I had, you know, all the exact

22    dates.  The money wasn't available right away for the SBA

23    loan.  So, I'm...  Be honest, I'd have to say it was probably

24    around a million one point -- one point one seven five

25    million.  Somewhere in there.  I don't have the numbers in

1    front of me.  I'm sorry.  The exact numbers.

2         Q.   Okay.  Are you familiar with Arnie's Bowling and

3    Recreation Center, Inc.?

4         A.   Yes, I am.

5         Q.   I'm sorry.  What I previously handed you was --

6         A.   Kwitchurbeliakin.

7         Q.   -- Creditor's Exhibit B, wasn't it?

8         A.   Yes.

9         Q.   Exhibit B?  This is --

10        A.   Yes.

11        Q.   I'd like to hand to you what has been marked as

12   Debtor's Exhibit C.

13        A.   Okay.

14        Q.   I thought it was B.

15        THE COURT:  Subse-...  The previous one was Exhibit B

16   that we were talking about?

17        MS. PARR:  It was B.  And --

18        THE COURT:  And now, now we're on C.

19        MS. PARR:  Now C.

20        THE COURT:  Okay.

21        MS. PARR:  Q.  Can you identify the first page of this

22   document?

23        A.   It is the Certificate of Authority for the State of

24   Indiana for Arnie's Bowling and Recreation Center,

25   Incorporated.

1          Q.    And the second page?

2          A.    It is the Arnie's Bowling Center or Bowling and

3     Recreation Center, Incorporated, from the State of Michigan

4     for the incorporation.

5          Q.    And, then, on Page 3 and 4?

6          A.    It's the Articles Incorporation, Articles of

7     Organization for Arnie's Bowling and Recreation Center.

8          Q.    And, then, starting with Page 5.

9          A.    The Operating Agreement for Arnie's Bowling and

10    Recreation Center.

11         Q.    And, then, if you'll look towards the back of the

12    last two documents?

13         A.    Yes.

14         Q.    The second page from the back, can you identify

15    that document?

16         A.    That is our registered Retail and Merchants

17    Certificate from the State of Indiana for Arnie's Bowling and

18    Recreation Center.

19         Q.    And for which year?

20         A.    That's current.  It's good through June 30th, 2011.

21         Q.    Okay.  And, then, can you identify the last

22    document?

23         A.    It is the Alcohol and Tobacco Commission Retailer

24    permit for Arnie's Bowling and Recreation Center.

25         Q.    And what is the date of this document?

1          A.   That is good through September 17th, 2010.

2          Q.   Okay.  Now these two entities were created on or

3     about the same time; is that correct?

4          A.   Correct.

5          Q.   And what was the purpose of creating the

6     corporation?

7          A.   Arnie's...  Well we --

8          Q.   Yes.  Arnie's.  Was --

9          A.   To operate the business.  To operate the bowling

10    center.

11         Q.   And the purpose and function of the LLC?

12         A.   Was to be the landlord of the bowling center and

13    Arnie's would lease it from them.

14         Q.   Did there come a time that -- or did you ever

15    apprise LaPorte Savings Bank of the existence of Arnie's?

16         A.   Applied?  What do you mean on...

17         Q.   Did you ever bring to the attention of anyone at

18    LaPorte Savings Bank about the existence of Arnie's?

19         A.   We had a checking account though them.  The day of

20    the loan our accountant was there and I believe he also told

21    them, you know, that we had two separate entities.

22         Q.   Were there a particular person in particular that

23    you spoke with?

24         A.   Mr. Klosinski was there at the day of the closing.

25         Q.   And was this account with Arnie's open at the same

                                  54

1    time that the loan was closed?

2         A.   Yes.  That day.  Or right around that day.

3         Q.   Did you explain to Mr. Klosinski the purpose of

4    Arnie's?

5         A.   I believe so.  I don't know for sure.  I believe

6    so, though.

7         Q.   Okay.  This was in 2005.  Is that correct?

8         A.   Correct.

9         Q.   So, what is the relationship between

10   Kwitchurbeliakin and Arnie's?

11        A.   Kwitchurbeliakin is the owner of the property and

12   building and the machinery and Arnie's leases the building

13   and operates the business from them.

14        Q.   Okay.  I'd like to hand you what has been marked as

15   Debtor's Exhibit A.  It has also been marked as Creditor's

16   Exhibit Number 4.  Can you identify that document?

17        A.   It's the Commercial Lease agreement between Arnie's

18   Bowling and Recreation and Kwitchurbeliakin.

19        Q.   Okay.  And if you'll turn to the signature page?

20   And do you recognize your signature on that document?

21        A.   Yes, I do.

22        Q.   And in what capacity did you sign that document?

23        A.   As Kwitchurbeliakin Vice President.

24        Q.   Okay.  And who signed as on behalf of Arnie's?

25        A.   Luise Lesser.

55

1      Q.   And who are the stockholders of Arnie's Bowling and

2   Recreation?

3      A.   Myself and Luise Lesser.

4      Q.   Okay.  Mr. Apfel, do you recall when you began

5   operations at what is now known as Thunderbird Lanes?

6      A.   Yes.

7      Q.   Do you recall the month and year?

8      A.   That was May 31st, 2005.

9      Q.   Okay.  And you began operations on that date.  What

10  entity was operating the business?

11     A.   Arnie's Bowling and Recreation Center,

12  Incorporated.

13     Q.   Okay.  And at the time that you began operations as

14  Arnie's...  Let me strike the question.

15          What role...  Well, what additional role, if

16  any, did Kwitchurbeliakin perform other than as landlord of

17  this building?

18     A.   None.

19     Q.   And how many creditors does Kwitchurbeliakin have?

20     A.   They sway(sic) two.  The Small Business

21  Administration and LaPorte Savings Bank.

22     Q.   What are the sources of revenue for

23  Kwitchurbeliakin?

24     A.   Arnie's Bowling and Recreation Center.

25     Q.   Did there come a time when you were unable to make

56

1    your payment to LaPorte Savings Bank?

2        A.   Yes.

3        Q.   And when was that?

4        A.   Uh...

5        Q.   When...  When you first were unable to make those

6    payments.

7        A.   That would have been last spring.  Prob-...  The

8    month of May.

9        Q.   And what are the reasons as to why you were unable

10   to make your -- that payment to LaPorte Savings Bank?

11       A.   Arnie's Bowling Recreation had a bad month of

12   April.  We weren't able to.  They weren't able to provide

13   enough funds for that.

14       Q.   Now, why did Arnie's have a bad month of April?

15       A.    My belief is the economy.  Yes, some leagues have

16   left.  I don't believe the numbers that Mr. Burchiel gave me

17   were quite accurate in the number of league bowlers that we

18   took on when we took on the center.  There were...  I mean,

19   we've lost probably three to four hundred league bowlers.

20   We've also gained quite a few open play bowlers.  It's...

21   Since January of this year we marketed heavily towards, you

22   know, open play.  They do pay more money.  It's been...  It's

23   been a pretty...  You know, last couple of months there's

24   been an upturn for us.  Throughout the bowling industry, when

25   looking at the numbers, our league numbers aren't down that

                                57

1    much more than what the national, nationwide numbers are and

2    especially in, you know, our area.  I think the economy's hit

3    us worse than it has some other areas.

4         Q.   Okay.  Do you try to keep up with the trends in the

5    industry?

6         A.   Very much so.

7         Q.   And how do you manage to keep up with those trends?

8         A.   I have a lot of fellow proprietors that I'm friends

9    with throughout the State and throughout the country.  We run

10   a --

11        Q.   I'm sorry.  Let me stop you.  Do you belong to an

12   association?

13        A.   Yes.  The Bowling Proprietors' Association of

14   America.

15        Q.   Okay.

16        A.   I --

17        Q.   And how long have you been a member of the Bowling

18   Proprietors' Association of America?

19        A.   We joined the second year that we had it.  I...

20   And I may be out of turn.  I don't know if the Burchiels were

21   members of that or not.  We joined that.  We also run the

22   youth tour vet- --

23        Q.   I'm sorry?

24        A.   A youth tour, youth bowling tour.  It's held at

25   different bowling centers throughout the Midwest two weekends

1    a month.  So, I do see a lot of centers, get to talk to a lot

2    of proprietors; so, I do, you know, have a good feeling for

3    what's going on throughout our industry.

4        Q.   Okay.  You testified earlier that you thought it

5    meant(sic) in the economy.  Are you specifically making

6    reference to the recession?

7        A.   Yes, ma'am.

8        Q.   Okay.  Do you recall the number of league bowlers

9    that you had in May, on May 31st of 2005?

10       A.   Well, our... That's at the beginning of summer

11   league; so, it's a difficult number.  The following weeks,

12   when we started up, it was under nine hundred.  Somewhere

13   between eights -- around eight seventy-five through nine

14   hundred.  I'm guessing closer to eight seventy-five.

15       Q.   Okay.  Are the league numbers down in the summer

16   months?

17       A.   League numbers are way down in summer months.

18       Q.   Okay.  And prior to the Receiver's coming into the

19   business in February, do you recall the number of league

20   bowlers that you had at that time?

21       A.   We were around five hundred and seventy.  Five

22   hundred and seventy-five.

23       Q.   So, your lost(sic) from the date you began business

24   would have been only about three hundred?  Is --

25       A.   Yes, ma'am.

1         Q.   -- that correct?

2         A.   Yes.

3         Q.   Do you have any personal knowledge as to why you

4    lost those three hundred, approximately three hundred league

5    bowlers?

6         A.   The...  On...  Some of it is the economy.  Some of

7    the leagues weren't happy there.  They were looking for

8    excuses, you know.  I would rather have people that want to

9    be there.  They were looking for excuses to go.  I did not

10   tell them to go, but I did...  You know, if they want to go

11   exercise their right to bowl somewhere else, you know, that's

12   fine.  And that -- it makes for the atmosphere in the

13   building a lot better.  We've had a lot of -- in the last

14   year we've had a lot of compliments on the atmosphere in the

15   building, how there isn't so much negativity in there.  And,

16   you know, we're working hard to, you know, try to build

17   league numbers up even against, you know, the economy.

18        Q.   Okay.  Did there come a time when Arnie's Bowling

19   and Recreation Center wasn't able to make lease payment to

20   Kwitchurbeliakin?

21        A.   Last spring.  Yes.  In --

22        Q.   Okay.

23        A.   -- May of last year.

24        Q.   And, so, as a result of Arnie's not being able to

25   make its payment, you were not make -- you were not able to

                              60

1 make your payments or --

2   A. Kwitchurbeliakin was not.

3   Q. -- Kwitchurbeliakin's payment to LaPorte.  Is that

4 correct?

5   A. Correct, ma'am.

6   Q. Okay.  Mr. Apfel, could you testify as to the

7 condition of the roof on this particular building at the time

8 you acquired possession or Kwitchurbeliakin acquired

9 possession?

10   A. Yes.  To me, it's in the same shape it was the day

11 we acquired it.  That summer, when we went up in the attic,

12 there were buckets everywhere on the rafters up there

13 catching leaks that had come in.  Yes, we had put up some

14 plastic on the ceiling this year.  That is to keep the water

15 from dripping down onto the concourse.  In the past, before

16 we took over, there would be buckets in the concourse.  There

17 would be dips out onto the lanes.  And we've tried to divert

18 that so they don't -- customers don't see that when they come

19 in.  And that's, you know...  Actually, this year we've even

20 had to replace part of the ceiling so that we wouldn't have

21 that problem.  But I...  We did fix what was a major part of

22 the problem last summer over the flat roof that Mr. Burchiel

23 talked about and that leak has since been taken care of.  But

24 it is an old roof.  It needs a lot of work.  And, you know,

25 they did work on it.  We've had somebody last summer come in

61

1    and work on it.  You know, it's hard...  There's only been a

2    couple days this year where the wind and -- the wind and the

3    rain were just in the right spot where it came in in a leak

4    that we didn't know was there.  But we actually...  I

5    believe, this year the leaks have been, you know, a lot more

6    maintained than they ever have been.

7         Q.   Have you had sufficient funds to replace the roof?

8         A.   No, we have not.

9         Q.   Okay.  Have you ever gotten a estimate as to what

10   it would cost to replace that roof?

11        A.   I did, by two separate people.  One of them

12   actually was a league bowler.  And to fix it and fix it

13   properly, one of them quoted me, you know, a hundred and

14   twenty-five thousand.  The other one said it's worth more,

15   you know, it'd cost you more to fix it than it would to, you

16   know, completely rebuild.

17        Q.   Okay.  And has Arnie's or Kwitchurbeliakin had the

18   funds to replace that roof?

19        A.   No, ma'am.

20        Q.   You heard the testimony of and you were here, you

21   were present when Mr. Kloseski(phonetic) was testifying; is

22   that correct?

23        A.   Yes, ma'am.

24        Q.   And Mr. Burchiel as well?

25        A.   Yes, ma'am.

1        Q.   Well, let's first direct our attention to the

2    testimony of Mr. Burchiel in regards to the replacement of

3    the lights in the building.  Do you re-...  Let's talk about

4    inside lights for the bowling lanes.

5        A.   Yes, ma'am.  Inside lights were about a month away

6    from leagues finishing and the inside maintenance, painting

7    and everything we do is generally done during the summer

8    months when the leagues are not there and we've got time to

9    do it.  Inside lights were part of our, you know, project for

10   doing this summer.

11       Q.   Okay.  And the exterior lights?

12       A.   The exterior lights, we've contacted Nipsco's just

13   as they have.  They usually last about a month to month-and-

14   a-half and something goes wrong.  They have to come back out

15   and fix them.  Also, the rest of the exterior lights on our

16   building was another part of the summer project.

17       Q.   And the re-paving of the or the patching of the

18   parking lot?

19       A.   We had, during last summer, we went through and had

20   filled in all the potholes and during the winter, winter

21   months are tough with, you know, snow plows and everything,

22   tough on the parking lot.  We did not have the money to re-

23   pave, you know, the parking lot; so, we did...  What we did

24   do is fill in the potholes.

25       Q.   And do you agree with Mr. Kloseski's(phonetic)

63

1      contention that the roof leaks, the replacement of the

2      lights, and the -- or the need to replace lights and the need

3      to patch on -- repair the parking lot were the result of

4      mismanagement?

5           A.   No, ma'am.

6           Q.   Mr. Apfel, do you feel capable to act and perform

7      the services of your own Trustee?

8           A.   Yes, ma'am.

9           MS. PARR:  I have no other questions.

10          THE COURT:  Cross?

11

12     CROSS-EXAMINATION BY MR. PHILLIPS:

13          Q.   Mr. Apfel, turning to the two exhibits that your

14     Counsel gave to you; Exhibit, I think it is... Debtor's

15     Exhibit B and C?

16          A.   Yes, sir.

17          Q.   If you turn to... If you lay those side by side,

18     one next to the other, and turn to Page 3 of each of those or

19     to both of those exhibits, Kwitchurbeliakin, Exhibit B,

20     that's you and Luise Lesser.

21          A.   Yes, sir.

22          Q.   Arnie's Bowling, Exhibit C, is you and Luise

23     Lesser.

24          A.   Yes, sir.

25          Q.   You work for Kwitchurbeliakin and you work for

1       Arnie's.

2            A.   Yes, sir.

3            Q.   She works for Kwitchurbeliakin and she works for

4       Arnie's.

5            A.   Yes, sir.

6            Q.   How do you know which hat you're wearing?

7            A.   Depending on what we're doing.

8            Q.   I see.  I see.  Let's put on the hat as a landlord.

9            A.   Yes, sir.

10           Q.   And as a landlord you think it's a good business

11      practice to let a tenant fall a year behind in rent without

12      taking action to evict them?

13           A.   It all depend...  On the economy, sir, it all

14      depends.

15           Q.   Isn't that exactly what you've done for

16      Kwitchurbeliakin?  You've allowed this tenant not to pay rent

17      for a year?  Thirteen thousand dollars a month unpaid month

18      after month after month?  That's what you've done, isn't it.

19           A.   Yes, sir.

20           Q.   And you've taken no action whatsoever as the

21      landlord to put an end to the fact the tenant's not paying

22      any rent.  Correct?

23           A.   That's why we have filed for bankruptcy.

24           Q.   I see.  And you think that you should be allowed to

25      continue to run the business and allow the tenant to stay

65

1   there without paying any rent.  Is that what you want this

2   Court to do?

3        A.   We do have a plan to bring it back, sir.

4        Q.   You do.

5        A.   Yes, we do.

6        Q.   I won't get into what that plan is.  But the fact

7   of the matter is that you and Luise Lesser live at the same

8   address.  And according to the documents, it's 355 Canterbury

9   Drive in LaPorte, Indiana; is that correct?

10       A.   We used to.

11       Q.   Where do you now live?

12       A.   I live on 1311 Scott Street in LaPorte.

13       Q.   Does she live there also?

14       A.   No.

15       Q.   When you say we filed bankruptcy, are you telling

16  me that you also filed bankruptcy on behalf of Arnie's

17  Bowling and Recreation Center, Incorporated?

18       A.   Yes.

19       Q.   So, both businesses are in bankruptcy.

20       THE COURT:  Wait.  Was that a yes?

21       A.   Yes.

22       THE COURT:  Okay.  Thank you.

23       MR. PHILLIPS:  Q.  So, both businesses are in

24  bankruptcy.

25       A.   We filed so we can restructure the company, yes.

1          Q.   And you want to continue to operate both companies

2     despite the fact that you've drove them right into

3     bankruptcy.

4          A.   Sir --

5          Q.   You think that's a good idea?

6          A.   We have a plan to bring it back.

7          Q.   And you think that's a good idea.

8          A.   I believe in our plan.

9          Q.   Now, your rent agreement, which I think is

10    Exhibit...  The Creditor's Exhibit 4, which is also Debtor's

11    Exhibit A, states that the landlord's going to pay the taxes.

12    That hasn't --

13         A.   Yes.

14         Q.   -- been done either, has it?

15         A.   I believe we're one year behind, not two, but....

16         Q.   Okay.  And insurance.

17         A.   We have insurance.

18         Q.   You have insurance?  Okay.  Improvements and

19    alterations.  Who's supposed to pay for that?

20         A.   Kwitchurbeliakin.

21         Q.   Okay.  But that hasn't been done either.

22         A.   We have done improvements.

23         Q.   Repairs.

24         A.   We've done repairs.  The scoring system to which

25    they were referring to was repaired last summer.  It has

67

1    worked fine this year.  It's...  They're very expense.  To

2    purchase a new one is a quarter of a million dollars.  We

3    were able to go out and get spare parts and the lanes, the

4    scoring has worked fine this winter.

5        Q.   Just so -- just so we're all on the same page, we

6    all understand the manner in which you've run the business of

7    the bowling alley and the business of the landlord.  The

8    business of landlord you've told your -- you basically told

9    the tenant, who is you, don't, don't...  You don't have to

10   pay any rent.  In the business of the bowling alley, which is

11   Arnie's, they're collecting the cash from all these bowlers

12   that you've been talking about, but not paying any rent and

13   not paying any bills.  Right?

14       A.   The only bills we have not paid were to LaPorte

15   Savings Bank and the Small Business Administration.

16       Q.   And the taxes?

17       A.   That's right.

18       Q.   And the rent?

19       A.   The rent is from Arnie's.

20       Q.   But Arnie's has been collecting all that money.

21   Right?

22       A.   Correct, sir.

23       Q.   How does Kwitchurbeliakin get any money if Arnie's

24   isn't paying?  You just take it from the cash register?  Is

25   that what --

68

1          A.    No, we do not.

2          Q.    -- you do?

3          A.    No.  We transfer the funds.

4          Q.    Oh, you do.

5          A.    Yes.

6          Q.    So, you take the money out of Arnie's' account and

7     you put it in Kwitchurbeliakin account.

8          A.    Correct, sir.

9          Q.    And sometimes you move it back and forth, depending

10    on how you need it.

11         A.    No, we do not.

12         Q.    No?  Okay.  So, Kwitchurbeliakin uses Arnie's'

13    money when it needs to.

14         A.    No, it does not.  It uses its own.

15         Q.    But it's money that comes from Arnie's' account.

16         A.    It's...  No.  It's paid to Kwitchurbeliakin from

17    Arnie's, yes.  All money goes to Arnie's and, then, Arnie's

18    pays Kwitchurbeliakin.

19         Q.    For what?  Rent?

20         A.    For rent.

21         Q.    You understand that your agreement with LaPorte

22    Savings Bank -- I should say the Kwitchurbeliakin agreement

23    with LaPorte Savings Bank includes a provision that all the

24    rents go to the Bank.  You're aware of that, aren't you?

25         A.    I'm...  Don't have that in front of me.  I'm not --

69

1        Q.   Let me get it front of you.

2              This is Creditor's Exhibit 1?  Paragraph 14?

3        A.   (No audible response.)

4        Q.   See where it says assignment of rent?  Where

5   Kwitchurbeliakin's assigned rent?

6        A.   (No audible response.)

7        Q.   It's Paragraph 14.  No, I don't have it.  Can't

8   find a page number here.

9        THE COURT:  Mr. Phillips, you've lost me.  Where --

10       MR. PHILLIPS:  Yeah.

11       THE COURT:  What exhibit are you on and what page?

12       MR. PHILLIPS:  I'm on...  I'm on Exhibit A.

13       THE COURT:  Okay.

14       MR. PHILLIPS:  Excuse me.  Creditor's Exhibit 1.

15       THE COURT:  All right.

16       MR. PHILLIPS:  And if you flip through to the...  Well,

17  let's see.  It would be Page...  And the pages aren't

18  numbered.  One, two, three, four, five, six, seven, eight,

19  nine, ten.  Okay.  Thirteen pages in.

20       THE COURT:  Okay.  Go ahead.

21       MR. PHILLIPS:  Okay.

22       Q.   Were you aware of the fact that the Bank was

23  entitled to those, those rents and lease payments?

24       A.   Uhmm...  I really don't know how to answer that

25  one.  This was set up by our accountant and....

70

1          Q.   Well, the question is easy.  Either you're aware or

2     you weren't.

3          A.   I'm not aware.  No, sir.

4          Q.   Okay.  But if there had been rent payments made,

5     you certainly haven't taken the time as the landlord to

6     transfer those under this mortgage; is that right?

7          A.   Right.

8          Q.   You kept them.

9          A.   No rent payments were made, sir.

10         Q.   Well, what payments were made to Kwitchurbeliakin

11    from Arnie's if they weren't rent payments?

12         A.   Well, prior to this...  You mean, from -- in the

13    beginning?

14         Q.   Well, yeah.  Let's --

15         A.   I'm....

16         Q.   Let's talk about the last year, year-and-a-half,

17    about last year.

18         A.   Okay.

19         Q.   When you've told us there were no rent payments

20    made.

21         A.   Right.

22         Q.   What money did you take from Arnie's during that

23    period of time?

24         A.   To pay our bills.  We didn't do anything under

25    Kwitchurbeliakin during that time.

                                71

1          Q.   I see.  So, the fact of the matter is you've

2     just...  You just used Arnie's and Kwitchurbeliakin as you

3     need to to take whatever money you actually need to operate.

4          A.   No.  We took the money in as Arnie's, paid our

5     bills.  We have not transferred any money to Kwitchurbeliakin

6     since last spring.

7          Q.   And you've never provided any financial information

8     to the Bank as requested.

9          A.   I believe...  And I would disagree.  I was certain

10    that every June they ask us for a financial statement.  I

11    believe they got one last June like we have every other year.

12         MR. PHILLIPS:  That's all the questions I have.

13         THE COURT:  Mr. Edgar?

14         MR. EDGAR:  Yes.

15

16    CROSS-EXAMINATION BY MR. EDGAR:

17         Q.   Now, Mr. Apfel, you were...  You've been

18    conscientiously serving as Vice President of Kwitchurbeliakin

19    since the inception of that company.  Is that correct?

20         A.   Yes, sir.

21         Q.   And you've also been acting as its representative

22    during its two lives in Bankruptcy Court.  Is that correct?

23         A.   Correct, sir.

24         Q.   Okay.  Is there anybody else handling the

25    Bankruptcy matters on behalf of the corporation other than,

1        of course, Counsel have?

2             A.   No, ma'am(sic).

3             Q.   All right.  Now, have you filed the Schedules and

4        Statement of Financial Affairs in your current Bankruptcy

5        case?

6             A.   With...  I've given our information to Rosalind,

7        yes, Miss Parr.

8             Q.   You've given the information to Counsel?  Is that

9        what you're saying?

10            A.   Yes.

11            Q.   Now, were you aware that that information, those

12       Schedules and Statement of Financial Affairs were supposed to

13       have been filed on or before March, I believe, 18?

14            A.   I believe...  Like I say, I have given her

15       everything she has asked for and....

16            Q.   Well, the bottom line is those documents have not

17       been filed with the Court nor made available to the U.S.

18       Trustee or creditors, have they?

19            A.   I wasn't aware.  I've given....

20            Q.   Is Kwitchurbeliakin current in the filing of all

21       Federal and State tax returns?

22            A.   Up until this year, yes.

23            Q.   Up till this year?

24            A.   Well, we haven't done the 2009 ones yet.  They're

25       not complete.

1          Q.   All right.  Now, have you and Ms. Lesser been

2     receiving any compensation from Kwitchurbeliakin?  Since --

3          A.   No, sir.

4          Q.   Since the inception of the corporation?

5          A.   No, sir.

6          Q.   All right.  Now, help me here, sir.  If... If the

7     corporation has not been paying the Bank and if the

8     corporation has not been paying its real estate taxes and if

9     the corporation has not been paying you and Miss Lesser

10    compensation, where has all the money gone?

11         A.   What money we had, we did pay the Bank up until we

12    could.  And, I mean, we haven't...  We had to sell some

13    personal property to help, help us get through the year

14    befores(sic).

15         Q.   Well, how many partial payments have you made on

16    the Bank loan?

17         A.   We have not made any.

18         Q.   Well, surely, sir, as a responsible borrower, you

19    would have gone to the Bank and said I've got these problems.

20    Can we reduce the payments?  Can we give you a half payment?

21    Did you make those contacts?

22         A.   We talked with Mr. Porter at the Bank and he said

23    nothing could be done to -- to restructure the loan.

24         Q.   So, the bottom line is you made no partial payment.

25         A.   No, we did not.

74

1          Q.    And come this April you'll be a full twelve months

2     behind in your bank payments.  Is that correct?

3          A.    Yes, we will, sir.  Well, it's a --

4          Q.    So --

5          A.    -- it's a seasonal loan; so...  It will be one year

6     since the last payment.

7          Q.    Now, if you clarify one other thing.  The loan with

8     the Bank was between Kwitchurbeliakin and the Bank.  Right?

9          A.    Yes, sir.

10         Q.    All right.  When was it that you informed the Bank

11    of this lease arrangement with Arnie's?

12         A.    I believe it was the day of our signing.

13         Q.    Now, this gentleman over here, Mr. Klosinski, is

14    the loan officer.  Right?

15         A.    Correct, sir.

16         Q.    So, you would have told him; right?

17         A.    I believe it was that day, yes.

18         Q.    All right.  So, if he says that didn't happen....

19         A.    We did have our accountant with us to tell you

20    everything and when exactly what time that day everything

21    happened...  There was a lot going on.  I don't know, but we

22    did open up an account under Arnie's that day also.  In fact,

23    I believe the money was deposited into that account.

24         Q.    Well, when, when did you notify the Bank in writing

25    of this side deal with Arnie's?

                                   75

1          A.   I did not realize we had to because of all the...

2     That everybody was there.  Nobody requested it from us.  I

3     bowled with Mr. Klosinski for three years after that and

4     nobody asked us for it.

5          Q.   Is Mr. Burchiel here an honest man?

6          A.   I believe so.

7          Q.   He wouldn't lie, would he?  He's under oath like

8     you are.

9          A.   Correct.

10         Q.   Is he, in your opinion, knowledgeable in the

11    bowling business?

12         A.   I believe the times have changed in the last five

13    years and his version of the way a bowling center should be

14    run versus what needs to be done today to make it viable, I

15    think we have different opinions on that.

16         Q.   Well, would you agree with him that foundation of

17    good business is to satisfy your customers?

18         A.   As much as you can, yes.

19         Q.   And good public relations with your customers?

20         A.   As much as you can.

21         Q.   And good customer relations between

22    Kwitchurbeliakin and the Bank?

23         A.   Believe so.

24         Q.   So, those business philosophies haven't changed in

25    the last five years, have they?

                              76

1        A.   We have tried very hard to keep our customers

2   happy.

3        Q.   Now, how much did you spend on roof repairs?

4        A.   We...  Probably about five hundred dollars, six

5   hundred dollars.

6        Q.   Five or six hundred dollars.

7        A.   Yes.

8        Q.   So, all the money that's been coming in to

9   Kwitchurbeliakin or Arnie's, depending on your point of view,

10   that money wasn't used to make roof repairs, was it?

11        A.   There wasn't enough money to...  To fix that roof

12   properly?  No.  There wasn't enough money to do that.  These

13   are band-aids, not a fix.

14        Q.   How would you describe, sir, your relationship as

15   an officer of Kwitchurbeliakin and the Bank right now?

16        A.   It's stressed.

17        Q.   Stressed.  Would you go so far as to say very

18   stressed?

19        A.   Very stressed.

20        Q.   And I'm correct, because I haven't seen any

21   Schedules or Statement of Financial Affairs, which I think

22   you testified that the only creditors, really, are -- for

23   Kwitchurbeliakin --

24        A.   Correct.

25        Q.   -- the Bank and the SBA.

77

1          A.   Yes.

2          Q.   So, this is essentially a two-party dispute between

3     Kwitchurbeliakin and the Bank.

4          A.   Correct.

5          Q.   I'm curious, sir.  Since you have a fiduciary

6     obligation to both Kwitchurbeliakin and Arnie's, how do you

7     resolve any issues that come up where the two entities are in

8     conflict?

9          A.   Such as?

10         Q.   Well, let's say that Kwitchurbeliakin has to sue

11    Arnie's.  How do you do that, sir, since you're representing

12    both entities?

13         A.   I don't think one would sue the other.

14         Q.   And you're saying that in your fiduciary capacity?

15         A.   If we had to, but I don't see where that -- where

16    we would have to.

17         Q.   Well, you may not want to, but, sir, as part of

18    your duties as a Debtor in Possession, that may become

19    necessary and I'm asking you how you do that when effectively

20    you'd be suing yourself and your former girlfriend?

21         A.   I do not know.

22         MR. EDGAR:  No further questions, Your Honor.

23         THE COURT:  Miss Parr, any more questions?

24         MS. PARR:  No questions.

25         THE COURT:  Okay.

78

1          MR. PHILLIPS:  I have nothing.

2          THE COURT:  You may step down, sir.  Thank you.

3     Miss Parr, do you have any other witnesses?

4          MS. PARR:  No other witnesses.

5          THE COURT:  So, you're resting?

6          MS. PARR:  Yes, we're resting.

7          THE COURT:  Okay.  Let's take about a ten-minute break

8     here so you can collect your thoughts and we'll have final

9     argument when ten minutes are up.

10         COURTROOM DEPUTY:  Please rise.

11      (Whereupon, a recess was had in the proceedings.)

12         COURTROOM DEPUTY:  Please be seated.

13         THE COURT:  Okay.  Mr. Phillips.  It's your motion.  You

14    get to go first on final argument.

15         MR. PHILLIPS:  Thank you, Your Honor.  Again, I'll try

16    to be as brief as I can, but there are a few things that need

17    to be said here.

18              As I stated in my opening statement, I think, as

19    the evidence has borne out, this is a petition that's being

20    presented under Section 1104 of the Bankruptcy Act.  That

21    Statute allows and it, depending on how you read it, can

22    sometimes seem to be -- require a court order under certain

23    circumstances to appoint a Trustee where there's cause.

24    Cause is defined as dishonesty, fraud, in some cases,

25    mismanage- -- gross mismanagement, and/or incompetence.  And

79

1    at the second part of that Statute, (a)(2), talks about

2    appointment of a Trustee if it's in the interest of the

3    creditors.

4              Here we have the situation, Your Honor, where

5    I think the evidence cries out for the appointment of a

6    Trustee.  We have one primary creditor.  That being LaPorte

7    Savings Bank.  LaPorte Savings Bank has lost all the

8    confidence and faith that it has in this Debtor and the

9    actions of the Debtor speak more loudly than any words that I

10   can muster up there this afternoon.  The Debtor's not paid

11   the mortgage payment.  It's not paid the real estate taxes.

12   It has -- had hidden from the Bank the existence -- the dual

13   existence of this sister corporation that has the same owners

14   where they transfer money back and forth from corporation to

15   corporation.  There's a formal contract, a lease agreement

16   between these two sister corporations and the Debtor in

17   Possession has allowed that tenant to go for a year without

18   paying rent and without taking any action to collect that

19   rent.

20             I think the U.S. Trustee, attorney, was right

21   on target here when he talked about the fiduciary

22   responsibilities of the Debtor in Possession with respect to

23   the assets of this Bankruptcy Estate.  That person needs to

24   initiate an action against himself.  And, as we heard on the

25   witness stand, he is reluctant or not willing to do that.

1              We need to have a Trustee appointed here --

2     and I think that we have met the high standard of proof that

3     the law requires of us in cases such as this.  Certainly we

4     don't take this issue lightly.  We don't -- we don't come

5     here today just because it's something that we, we've --

6     we're going to try to fill our time with.  Well, we have

7     twenty-five years of history with respect to the operation of

8     this bowling alley, as testified to by Mr. Burchiel.  All

9     previous owners financed their operations through LaPorte

10    Savings Bank.  The financials were well known to this Bank.

11    They knew that this was an extremely profitable business.  As

12    Mr. Burchiel says, in the five years before he turned it over

13    to the Debtor in Possession, Mr. Apfel, he was able to earn

14    enough money that he and his wife could retire at age fifty-

15    five.

16              In the interim period of time, the business

17    has been so grossly mismanaged, so incompetently managed,

18    that the number of league bowlers, which had been described

19    as the bread and butter of this business, has decreased from

20    almost twelve hundred and sixty-seven to a number less than

21    six hundred.  I think five hundred and twenty, I think is

22    what the number was that was testified to by Mr. Burchiel.

23              Those bowlers went to the competitors and why?

24    They went to the competitors because the Debtor in Possession

25    told them go.  Even paid somebody to leave.  That's the type

1    of mis- -- gross mismanagement, that's the type of

2    incompetence that requires that a Trustee be appointed in

3    this case.  We think that's extremely important from the

4    standpoint of LaPorte Savings Bank that we have a Trustee.

5    Mr. Burchiel was the Receiver appointed by the LaPorte

6    Superior Court in the State Court action that preceded the

7    filing of the bankruptcy.  Went in and was able to identify

8    almost immediately some of the problems associated with the

9    running and the management of the business.  We would ask

10   that the Court consider appointing him as Trustee in this

11   case so that we can get back in and hopefully resurrect this

12   business and the remnants of this business before it is all

13   lost and the security for the debt that's owed to LaPorte

14   Savings Bank is completely destroyed.  We ask that the Court

15   grant this petition to appoint a Trustee and we ask that

16   Mr. Burchiel be that person appointed.

17        THE COURT:  Just as a point of law, if I were to rule in

18   the Bank's favor, it's the U.S. Trustee's office that would

19   appoint the Trustee.  The Court doesn't have that --

20        MR. PHILLIPS:  I --

21        THE COURT:  -- power.

22        MR. PHILLIPS:  I -- I know that.

23        THE COURT:  Okay.  Okay.

24        MR. PHILLIPS:   But we, we still...  We still would ask

25   that.

1          MR. EDGAR:  I understand that.  Thank you, You Honor.

2          THE COURT:  Miss Parr, would you like to give me your

3     closing argument, please?

4          MS. PARR:  Yes.  As Mr. Phillips indicated, the

5     governing Statute is Section 1104 of the Bankruptcy Code.

6     And this section sets forth, sets forth grounds under which

7     the Trustee can be appointed.

8               Typically in a Chapter 11 bankruptcy, the

9     Debtor, of course, becomes the Debtor in Possession.  And

10    under Section 1107, the Debtor in Possession has the rights

11    and duties and powers of a Trustee.  And that the appointment

12    of a Trustee is an extraordinary remedy.  For a Trustee to be

13    appointed in a Chapter 11 case, those grounds need to be

14    satisfied in an 11 under Section 1104.  And there has been

15    absolutely no evidence presented before this Court showing

16    that the management of Kwitchurbeliakin has been incompetent

17    or has grossly mismanaged the company.

18              The sole duties and responsibility of

19    Kwitchurbeliakin are to maintain and control or, well, to

20    maintain and own the business.  Essentially, their only other

21    obligation is to receive rent.  And, so, when we're talking

22    about the operation of the bowling center, that is the duty

23    and responsibility of Arnie's.  And Arnie's, of course, is in

24    a Chapter 11 itself.

25              So, we've heard a lot of hearsay testimony.

83

1    When both the witnesses on behalf of the Creditor were

2    questioned, it became abundantly clear they're relying on

3    statements made by others who were not present here today;

4    that, based upon their own personal observations, you know,

5    what they saw, those are really -- is not tantamount to

6    mismanagement or incompetence.

7              They talked about a leaky roof.  A leaky roof

8    that Kwitchurbeliakin could ill afford to repair, even if it

9    probably was profitable at this point.  We're talking about

10   the replacement of interior and exterior lights.  That's not

11   mismanagement.  That's not incompetence.  The... Mr. Apfel

12   fully explained the reasons as to why the actions were

13   delayed in correcting that situation.  We heard nothing;

14   nothing was presented before this Court as to what one would

15   consider to be truly mismanagement where there's funds being

16   diverted to, to other activities that are inappropriate.

17             In the closing argument for the Creditor,

18   there is this reference to monies being exchanged between the

19   two corporations when it was clear that Mr. Apfel testified

20   that it wasn't.  And there was no other evidence otherwise;

21   that, when Mr. Apfel testified, he made it clear that the

22   Bank knew of Arnie's existence from day one and that they

23   even established a checking account at LaPorte Savings Bank.

24   So, it's not even hardly credible that LaPorte Savings Bank

25   didn't become aware of the existence of Arnie's until

84

1    recently.

2              The law is clear.  There is a strong

3    presumption against the appointment of a Trustee.  And the

4    Creditor has not overcome that presumption.  The Creditor has

5    talked about the non-payment of rent.  I'm sorry.  The non-

6    payment towards its loan.  Well, I would suggest to this

7    Court that every other Debtor who has filed a Chapter 11 who

8    has a mortgage is in arrears in its mortgage.  And, so,

9    that's not an unusual circumstance.  That's typical.  Even

10   when it comes to the payment of real estate taxes, again,

11   that is not an unusual circumstance.  That is typical with a

12   Chapter 11 Debtor.  That is why we are filing.  Many times as

13   not because they have fallen in arrears on payments to

14   creditor, including their secured creditors.  Their mortgage

15   payment, their real estate taxes.  So, there's nothing

16   unusual about that that requires the appointment of a

17   Trustee.

18             And as far as the Creditor's request for the

19   appointment of Mr. Burchiel as the Trustee, well, I think the

20   Statute makes it clear should be a disinterested person.

21   We're not agreeing to it, by any stretch of the imagination.

22   But just the fact that they're asking for someone who is not

23   disinterested, I think is inappropriate.

24             Again, we believe that the Creditor has failed

25   to meet its burden by clear and convincing evidence as to why

85

1       a Trustee should be appointed in this case.  We are barely,

2       what, two weeks into this bankruptcy; just a little over two

3       weeks.  And, so, this Debtor hasn't even had an opportunity

4       to even process this bankruptcy without the Creditor having

5       come in and requesting a Trustee.  So, we are requesting that

6       the Court deny this motion and allow this Debtor to remain in

7       possession and to continue to exercise those duties and

8       responsibilities of a Trustee.  Thank you.

9           THE COURT:  All right, Miss Parr.  Mr. Edgar?

10          MR. EDGAR:  Your Honor, may it please the Court.  U.S.

11      Trustee would agree with Counsel on both sides that 1104(a)

12      controls this matter.  The question before the Court is have

13      grounds been established under 1104(a)(1), (2), (3), or any

14      number of combinations.

15              It's certainly true that 1104 cases are fact

16      sensitive.  Counsel's absolutely right when she says it's an

17      extraordinary remedy.  And I agree that the legal standard is

18      clear and convincing evidence.  So, let's look at what we've

19      heard today.  And, certainly, we've heard that -- or at least

20      I heard that this bank has absolutely no confidence in the

21      current debtor.  Now, this is essentially a single asset

22      case, single creditor case.  So, it's not like we're going to

23      have the benefit, Your Honor, of a Creditors' Committee

24      coming in with its independent judgment and so forth.  It's

25      basically a two-party dispute.  Which, of course, is what it

86

1    was just a short time ago when the State Court entered a

2    Receivership order.  Apparently, that Court heard enough

3    testimony to convince it the Receivership was necessary.

4              We have, at least in my mind, an unexplained

5    failure to pay a mortgage loan for approximately one year, to

6    pay taxes, real estate taxes, for one to two years, depending

7    on whose testimony you believe.  And, more immediately, we

8    have a creditor -- or, excuse me, a debtor in

9    Kwitchurbeliakin who hasn't been able to live up to even the

10   simplest obligations under the Code; that is, filing timely

11   its Schedules and Statement of Financial Affairs.  Those were

12   to have been filed by 3-18-10 as required and they haven't

13   been done.  There's been no motion to extend that time.  So,

14   if they did have a good excuse, they should have done it the

15   proper way and filed a motion to extend the time so that the

16   Court, creditors, and U.S.T. would know what the status of

17   the case was.  But that was not done.

18             Testimony seems to be clear that

19   Kwitchurbeliakin has not provided the financial information

20   as required under the loan documents.  There's been no

21   payment of partial payments, which would demonstrate to the

22   U.S. Trustee at least some good faith effort to pay as best

23   they could under their circumstances.

24             Counsel mentions hearsay testimony came in.  I

25   would submit there was a lot of hearsay testimony on both

87

1       sides coming in.  But it was un-objected to by either side.

2       So, this Court is free to listen to that testimony and

3       consider it for what its worth.  And let's think a little bit

4       about what it's worth.  Your Honor, I submitted to the Court

5       a one-page document which sets forth the -- what I thought

6       were the significant time line events in the history of

7       Kwitchurbeliakin, Arnie's, in this transaction.  And

8       everything seems to be in lock step.  The two entities,

9       Arnie's and Kwitchurbeliakin formed by the same two parties

10      at about the same time.  They have a closing.  And,

11      coincidentally, basically on the date of closing

12      Kwitchurbeliakin and Arnie's enter into an agreement whereby

13      Arnie's is going to be running the business.

14                  Now, I would submit, Your Honor, that that is

15      such a violation of the loan documents that if that had come

16      up back in May of '05 that that's something that the Bank

17      would surely have remembered.  Because, why, because they

18      were making the loan to Kwitchurbeliakin; not to Arnie's.

19      So, how could they be expected to look to Arnie's for

20      payment?  They could have asked for a personal guarantee or a

21      guarantee from Arnie's for the payment of the mortgage loan,

22      but that didn't happen.  So, it appears to U.S. Trustee, Your

23      Honor, that this, this side deal between Kwitchurbeliakin and

24      Arnie's was done in violation of the loan documents.  The

25      fact that, if I recall the testimony, the Bank indicated they

1     just learned about that recently.

2                    Found Mr. Burchiel's testimony to be

3     convincing.  Even the representative from the D.I.P.

4     acknowledged he was an honest man.  I didn't hear him say but

5     he's lying today or he was wrong in this or that or the other

6     thing, specifically having to do with Mr. Burchiel's

7     testimony.  So, I found his testimony to be particularly

8     convincing and compelling.

9                    Question I had is where did the money go?  I

10    mean, that's where I look at things.  I mean, follow the

11    money.  There's a reason that saying came about.  Follow the

12    money.  If Kwitchurbeliakin was not paying on its mortgage

13    for a year and hadn't paid taxes for one or two years and

14    wasn't even paying compensation, according to Mr. Apfel here,

15    then where did the money go.  We sure know it didn't go to

16    repairing a leaky roof.  I think the testimony was maybe five

17    or six hundred dollars.  I think Trustee would certainly have

18    to look into that and try to trace the money.  Where did the

19    money go?

20                    It would have been interesting, Your Honor,

21    if...  If the Debtor had provided copies of tax returns today

22    in evidence.  Been interesting to see what the tax returns

23    disclose.  Income, expenses, and that sort of thing.  What

24    was the Debtor doing, Kwitchurbeliakin?  But the Debtor chose

25    not to.  Those, those tax returns are not before this Court.

1    So, we don't have the benefit of looking at those tax returns

2    filed under oath.

3              It would appear, Your Honor, that the two

4    principals of Kwitchurbeliakin and Arnie's have an

5    irreconcilable conflict.  They, needless to say, have a

6    personal relationship going on.  That's their business.  But

7    they have fiduciary obligations to all their creditors in

8    both cases.  And as this gentleman pointed out, Mr. Apfel,

9    yeah, that would, that would be a little bit of a problem all

10   right, having to sue himself, discussing with himself am I

11   going to sue myself, am I going to sue my former, my former

12   companion.  That flies in the face of sound fiduciary

13   obligations and duties.

14             Credibility of witnesses, Your Honor, that's

15   up to the Court to decide.  All the exhibits have been

16   admitted into evidence without objection and, Your Honor, I

17   think if you plow through all those documents, thick as they

18   may be, you'll see that the Bank, in its loan documents,

19   required its approval before any sub-lease was entered into.

20   And there's no testimony that that actually happened.

21   There's vague references to it, but there's no document

22   provided by the Debtor saying, see, this is -- this is the

23   copy of the document I sent to the Bank.  Or other convincing

24   testimony that that happened.

25             So, those are the observations of the U.S.

90

1    Trustee, Your Honor.  And bottom line is it just...  The case

2    just doesn't pass the smell test.  It just doesn't all add

3    up.  And I believe it doesn't all add up to the standard of

4    the Court, clear and convincing evidence.  And picking up on

5    the Court's point, if the Court does order the appointment of

6    a Trustee, of course, we'll follow the Statute, consult with

7    both parties before making our appointment and submitting

8    that to the Court for final approval.  Thank you, Your Honor.

9        THE COURT:  Okay.  Give you one more opportunity,

10   Mr. Phillips and --

11       MR. PHILLIPS:  I'm done, Your Honor.

12       THE COURT:  Okay.  Miss Parr?

13       MR. PHILLIPS:  I stand on my argument.

14       THE COURT:  All right.  Anything further?

15       MS. PARR:  I do.  Your Honor, it seems that the U.S.

16   Trustee has essentially taken a position in support of the

17   Creditor.  But assuming that this motion was granted and a

18   Trustee was appointed, then what would be the Trustee's

19   duties and obligations?  Well, they essentially would be to

20   maintain the building.  Of course, as far as Debtor in

21   Possession.  And to receive rents.  Now, in regards as far as

22   the structure is concerned.  Now, this is not a complicated

23   Chapter 11 bankruptcy.  And, matter of fact, it's a fairly

24   simple one.  And I frankly don't see any need for the

25   appointment of a Trustee essentially to -- whose primary,

91

1    primary responsibilities are going to be simply to maintain

2    the building and to receive rents.  Certainly that's a role

3    that the Debtor in Possession can perform.

4              Again, I would ask...  And, then, on top of

5    that, then we're talking about the cost and expense of

6    appointing a Trustee.  Here we have a Debtor, who's not

7    receiving any revenues right now as it is, whose revenues are

8    dependent upon the success of Arnie's.  So, you have to look

9    to how are we going to pay a Trustee.  So, and unless Arnie's

10   is performing well, I certainly think it's an unnecessary

11   expense.  Again, this is not a complicated Chapter 11.  It's

12   very simple.  That the duties and obligations to be performed

13   by that Debtor can easily be performed by the Debtor in

14   Possession in spite of this lack of trust between the

15   Creditor and the Debtor.  That's why we have the U.S. Trustee

16   who helps monitors(sic) these cases.  And it's not as if

17   this Debtor in Possession is not -- is going to be acting

18   without monitoring by the U.S. Trustee.  And, so, I just

19   don't think it's necessary in this case for a Trustee to be,

20   to be appointed and that this Debtor in Possession should be

21   allowed to continue to serve and perform the duties and

22   responsibilities of a Trustee.

23        THE COURT:  Anything else?

24        MR. PHILLIPS:  No, Your Honor.

25        THE COURT:  Okay.  All right.  Well...  You're all

                              92

1    correct, of course, that we're here this afternoon under

2    1104(a), which is entitled Appointment of a Trustee or

3    Examiner.  And you're all correct that there's a high burden

4    that someone who wants a Trustee appointed must carry in such

5    a case before the Court should do so.  Cause is defined

6    loosely in the Statute.  It includes fraud, dishonesty,

7    incompetence, or gross mismanagement of the Debtor's affairs

8    by current management.  But it also goes on in sub-paragraph

9    (2) to say that the Court, after notice and a hearing, shall

10   order the appointment of a Trustee if such appointment is in

11   the interests of creditors.

12               I'm impressed by the fact that virtually all

13   of the testimony this afternoon has been truthful.  I think

14   Mr. Apfel testified truthfully.  I think Mr. Klosinski

15   testified truthfully and Mr. Burchiel testified truthfully.

16   So, the Court is left with a weighing process here of whom it

17   finds more credible or most credible of the three.

18               The evidence that most strikes me and the

19   facts that I find are that it's been at least a year since

20   there were payments made on the mortgage on -- that this

21   Debtor owes to this Bank.  There's been a failure to pay real

22   estate taxes for at least that, that length of time.  This is

23   from Mr. Klosinski and it's un-rebutted.  Mr. Klosinski has

24   been in and out of the physical facility many times;

25   testified that he bowled there for thirty years.  Said that

93

1    the facility is deteriorating.  The roof leaks, the parking

2    log needs resurfacing.  But more critical, the Debtor has

3    lost nine bowling leagues.  The leagues have moved to a

4    competitor in LaPorte.  And that the bowling leagues in the

5    bowling business are the lifeblood of a successful bowling

6    operation.

7              Now, does that rise to the level needed under

8    1104?  Maybe not, but let's go on and look at some more of

9    the evidence here.  I think what bothers me when I look at

10   this list of the history of transactions here that was

11   prepared by the U.S. Trustee's Office, these parallel

12   bankruptcies that are floating along here.  We've got

13   Kwitchurbeliakin, d/b/a Thunderbird Lanes, files January 14th

14   of 2010 pro se.  And, then, a second Kwitchurbeliakin, d/b/a

15   Thunderbird Lanes, is filed March 4th by Todd Apfel.  And,

16   then, parallel with those or with the second one is Arnie's

17   Bowling files on March 10th.  But Arnie's is also listed on

18   the petition as d/b/a Thunderbird Lanes.  So, by the Debtor's

19   filings, both of these are doing business, both of these

20   entities, which are separate corporate entities, I believe,

21   were doing business as Thunderbird Lanes.  And, then, the

22   documents show that the stockholders are the same, the

23   officers are the same.

24             It appears that Kwitchurbeliakin owns the

25   building and the parking lot and the evidence is that they're

94

1    deteriorating; whereas, Arnie's operates the business.  I

2    don't know how you can operate a bowling business without

3    having the parking lot and the building, but that's another

4    matter.

5              I don't know that that rises to fraud on

6    creditors.  Certainly the fact that a commercial lease was

7    entered into between those two entities without the consent

8    of the Bank is unusual and probably... Uhmm, I don't know if

9    I'll say dishonest, but I think it's...  I think it's

10   approaching the level of fraud.  Now, does that rise to the

11   standard, the clear and convincing standard that must be

12   carried for the appointment of a Trustee under 1104?  Well,

13   there's other evidence that's, that's kind of disturbing

14   here.

15             Miss Parr quite rightly wanted to know from,

16   from Mr. Klosinski, she wanted specific evidence about how

17   this place isn't being managed properly.  You know, what

18   evidence is there of a loss of business?  What evidence of

19   deterioration and so forth.  So, Mr. Klosinski responds my

20   league left.  I used to bowl there.  They youth bowlers have

21   left.  Nine leagues have left.  Mr. Apfel told me a year ago

22   if you don't like it go elsewhere.  Which seems kind of not

23   exactly the best way to attract customers to your, to your

24   enterprise.

25             Mr. Klosinski indicated that he tried to

95

1    resolve this without litigation.  Stopped by the place

2    personally.  He's had this loan with this particular business

3    entity over fifteen years, and while he's not an expert on

4    the operation of bowling alleys, he certainly is a commercial

5    lender with a well known and well regarded bank in LaPorte

6    County.  He's got to have experience in evaluating businesses

7    as a commercial lender.  And I can take judicial notice that

8    when bowlers leave and leagues leave, the revenues probably

9    are going to suffer.  Why would a competent businessman tell

10   people to hit the trail, go down the street?  In fact, I'll

11   even pay you to go down the street, which also is one of the

12   allegations here.

13           Let's go a little farther.  The banker

14   testified that he hasn't been -- the Bank hasn't been

15   provided with the statements that the contract calls for.  We

16   don't have any numbers for 2008 or 2009.  Well, if you're a

17   lender and your loan documents require that those be

18   provided, that puts you on alert something's going on that's

19   not good for the interest of my bank if I'm not getting the

20   documents.  Somebody's trying to hide something or there's

21   some kind of incompetence going on.  There's something not

22   right if we're not getting monthly operating reports, profit

23   and loss statements, a budget, different things that most

24   loan agreements call for.  We don't have those here.

25           Banker also testified that if we'd known of

96

1  this dual existence, we would have gotten a guarantee to

2  protect ourselves.  But they didn't know and, so, here we are

3  with two bankruptcies with this Bank on the outside looking

4  in and not receiving any payments, not getting any assurance

5  the taxes have been paid.

6          Then there is Mr. Burchiel, who testified, and

7  whose testimony I found very compelling and credible.  He ran

8  this bowling alley twenty-five years.  I suppose as an

9  employee for most of that time; but, then, he bought it in

10  2000.  Did well enough at it for five years he was able to

11  sell it and retire at age fifty-five.  Not bad.  Not bad.

12  And, then, the State Court appointed him as the Receiver.

13  Only there two weeks, I assume, because when the bankruptcy

14  was filed that terminated the authority of the State Court

15  receiver to be there.  But, when he went in, he already -- he

16  replaced lights.  He noticed problems with the roof.

17          I guess the most compelling part of his

18  testimony was his personal knowledge that at a peak when --

19  at the time when he sold out  in '05 there were twelve

20  hundred and sixty-seven league bowlers per week and now it's

21  down to five hundred and twenty.  And he indicated that those

22  numbers are within a handful here or there.  But it gives the

23  Court a picture that the number of bowling league -- league

24  bowlers is down substantially.

25          He made a substantial amount of money when he

97

1       owned it, was able to pay his debts and retire at age fifty-

2       five.  Would take some period of time to bring bowlers back.

3       Mr. Burchiel testified he'd never had a league leave in

4       thirty years.  And, in his opinion, only mismanagement could

5       cause a bowling league to leave.  And while it is, indeed,

6       hearsay and was not objected to, he testified that somebody

7       told him here's two bucks, Mr. Apfel said, go elsewhere if

8       you don't like it.

9               North side of the building the lights were

10      out.  Women league bowlers complain there's no lights over

11      there.  It's uncomfortable for women or anybody else to go to

12      your car in a parking lot at night when it's dark out.  When

13      Mr. Burchiel went in, he established checks and balances on

14      the cash register so when one bartender took over from the

15      next there's some way to track the funds and help prevent

16      fraud.  Testified that the Health Department had written up

17      the bowling alley prior to the time he became the Receiver.

18      And, so, in a very proactive way, when he got in there during

19      that two weeks, he cleaned the air filters above the grill,

20      worked on the disintegrating gasket on the freezer door,

21      brought in a new freezer ultimately.  Testified that to his

22      knowledge, living in LaPorte, most of the bowlers that this

23      place have lost -- has lost are going to the other center of

24      the town.

25              So, you know, as you start to listen to this

98

1    evidence come out and mount up, it, it soon becomes clear to

2    me as the fact finder that we have risen to the level of

3    clear and convincing evidence that there's been incompetent

4    management.  And we have risen to this, the level where the

5    other prong of this Statute that talks about the interests of

6    creditors being LaPorte here, the LaPorte Bank, that their

7    interests are being harmed by the continued management by

8    Mr. Apfel.

9         I was also struck by Mr. Apfel's testimony

10   that he has insufficient money to fix the roof.  Doesn't have

11   money to pay the Bank.  Doesn't have money to pay the real

12   estate taxes.  And, apparently, hasn't budgeted sufficient

13   money in a capital expense fund, which any business that I've

14   ever heard of has to have, to prepare for the inevitability

15   of repairs that are going to be necessary for the building.

16   You know, you've got to cut somewhere.  You've got to have...

17   You got to have money to fix the place or you're not going to

18   stay in business very long.

19        Miss Parr makes a good point that, you know,

20   if...  If it were gross incompetence and mismanagement that

21   mortgage payments weren't paid and that debts weren't paid

22   that we wouldn't have anybody...  I mean, every Chapter 11

23   ever filed would have to have a Trustee appointed.  That's...

24   But that's not what is so persuasive here.  It just seems to

25   me like a pattern that goes on and on here.  And, then, not

99

1    to... Not to put too fine a point on it, the incompetence or

2    the lack of sufficient management even extends into the

3    Chapter 11 that we've got because we don't have Schedules and

4    Statements of Financial Affairs. The 2009 tax return is not

5    due yet, I assume, but that hasn't been filed. But the

6    Statements of Financial Affairs and the Schedules were due

7    last week, March 18th, and they haven't been filed. Not a

8    good sign.

9            Bank's not being paid, real estate taxes

10    aren't being paid, salaries aren't being paid, no partial

11    payments to the Bank. Going to be twelve months behind to

12    the Bank in April. And, then, last, there's this whole

13    fiduciary issue of two entities here that are both in Chapter

14    11 both with the same president and vice president. Who's

15    going to sue whom if necessary? Who... You know, what... I

16    don't understand why that situation exists. Bottom line is

17    the Bank's lost faith in the Debtor for all the reasons I've

18    outlined. This place has not been run properly, which has

19    led up to the loss of customers and the inability to pay the

20    creditors here, and it seems to me that the burden of proof

21    of clear and convincing evidence has been met even in the

22    extraordinary remedy like the appointment of a Trustee under

23    Section 1104.

24            So, those are my findings of fact and my

25    conclusion of law is that I'm directing the Office of the

100

1      U.S. Trustee to appoint a Trustee under 1104(a)(1) and (2) to

2      manage this business under the supervision of the U.S.

3      Trustee's Office and the Court.

4           MS. PARR:  Excuse me, Judge.  I don't mean --

5           THE COURT:  Pardon me.

6           MS. PARR:  I don't mean to interrupt.

7           THE COURT:  Well, I was done --

8           MS. PARR:  How --

9           THE COURT:  -- so, go ahead.

10          MS. PARR:  However, we have a separate entity called

11     Arnie's Bowling and Recreation Center that actually operates

12     the business.  And, so....

13          THE COURT:  It would have been cleaner if an 1104 motion

14     had been filed on both of the entities, but that wasn't what

15     happened.  And all I'm caring about right now, Miss Parr, is

16     -- is what's before me and that's Kwitchurbeliakin.  What

17     happens concerning Arnie's, I'm sure will await future

18     events.  But I'm not going to solve a problem that's not

19     before me.  Okay.  We're adjourned.

20          MS. PARR:  (Unintelligible.)

21          MR. PHILLIPS:  Thank you, Your Honor.

22          COURTROOM DEPUTY:  Please rise.

23          MR. EDGAR:  Thank you.

24     (DISK ENDS)

25

STATE OF INDIANA  )

COUNTY OF ALLEN   )


    I, Sue Cowen, hereby certify that the foregoing pages represent an accurate and complete transcription of the record of the proceedings as transcribed by me from a disk provided by the United States Bankruptcy Court and had before the United States Bankruptcy Court, Northern District of Indiana, South Bend Division, Judge Harry C. Dees presiding, and typed to the best of my ability.

    I do further certify that I am a disinterested person in this cause of action and not related to or employed by any party or their counsels.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this ___29th___ day of _____April_____, 2010.


                       Sue Cowen   /s/_____


My commission expires:  October 17, 2017

County of Residence:  Allen County, Indiana


102