| | | |
|---|---|---|
| Kwitchurbeliakin LLC<br>La Porte IN 46350-1917 | The LaPorte Savings Bank<br>710 Indiana Ave<br>La Porte, IN 46350 | Loan Number __6110120__<br>Date __12/13/05__<br>Maturity Date __12/13/15__<br>Loan Amount $ __750,000.00__<br>Renewal Of __6099259__ |
| **BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and severally. | **LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | |

For value received, I promise to pay to you, or your order, at your address listed above the **PRINCIPAL** sum of
Seven hundred fifty thousand & no/100 _____ Dollars $ __750,000.00__

☒ **Single Advance:** I will receive all of this principal sum on __12/13/05__ . No additional advances are contemplated under this note.

☐ **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On _____
_____ I will receive the amount of $_____ and future principal advances are contemplated.
  **Conditions:** The conditions for future advances are _____
  _____

☒ **Open End Credit:** You and I agree that I may borrow up to the maximum principal sum more than one time. This feature is subject to all other
  conditions and expires on __DECEMBER 13, 2015__ .

☐ **Closed End Credit:** You and I agree that I may borrow (subject to all other conditions) up to the maximum principal sum only one time.

**INTEREST:** I agree to pay interest on the outstanding principal balance from __12/13/05__ at the rate of __8.0000__ %
  per year until __the first scheduled rate change - 01/01/06__

☒ **Variable Rate:** This rate may then change as stated below.

  ☒ **Index Rate:** The future rate will be __1.000% Above__ the following index rate: _____
    THE HIGHEST PRIME RATE AS STATED IN THE MONEY RATES TABLE IN THE
    WALL STREET JOURNAL

  ☐ **No Index:** The future rate will not be subject to any internal or external index. It will be entirely in your control.

  ☒ **Frequency and Timing:** The rate on this note may change as often as __Monthly__ .
    A change in the interest rate will take effect __on the first day of each month. (If The Index Changes)__ .

  ☒ **Limitations:** During the term of this loan, the applicable annual interest rate will not be more than __21.0000__ % or less than
    __5.0000__ %. The rate may not change more than __5.0000__ % each __Month__ .

  **Effect of Variable Rate:** A change in the interest rate will have the following effect on the payments:
  ☐ The amount of each scheduled payment will change.    ☒ The amount of the final payment will change.
  ☐ _____

**ACCRUAL METHOD:** Interest will be calculated on a __Actual/365__ basis.

**POST MATURITY RATE:** I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:
  ☒ on the same fixed or variable rate basis in effect before maturity (as indicated above).
  ☐ at a rate equal to _____

☒ **LATE CHARGE:** If a payment is made more than __10__ days after it is due, I agree to pay a late charge of _____
  5.000% OF THE PAYMENT

☐ **ADDITIONAL CHARGES:** In addition to interest, I agree to pay the following charges which ☐ are ☐ are not included in the principal amount
  above: _____

**PAYMENTS:** I agree to pay this note as follows:

☒ **Interest:** I agree to pay accrued interest __See Additional Terms For Alternate Repayment Schedule__
  _____

☒ **Principal:** I agree to pay the principal __See Additional Terms For Alternate Repayment Schedule__
  _____

☐ **Installments:** I agree to pay this note in_____ payments. The first payment will be in the amount of $_____
  and will be due _____ . A payment of $ _____ will be due _____
  _____ thereafter. The final payment of the entire
  unpaid balance of principal and interest will be due __DECEMBER 13, 2015__

☐ **Unpaid Interest:** Any accrued interest not paid when due (whether due by reason of a schedule of payments or due because of Lender's demand) will
  become part of the principal thereafter, and will bear interest at the interest rate in effect from time to time as provided in this agreement.

**PURPOSE:** The purpose of this loan is __EXTEND TERM TO TEN YEARS__

**ADDITIONAL TERMS:** ANNUAL FINANCIAL STATEMENT AND TAX RETURNS TO BE PROVIDED TO THE
  LAPORTE SAVINGS BANK
  CUSTOMER TO PAY $9,146.00 PER MONTH BEGINNING JANUARY 13, 2006 AND THE
  13TH OF EACH MONTH THEREAFTER WITH THE EXCEPTION OF JUNE, JULY, AND
  AUGUST WHEN NO PAYMENTS WILL BE REQUIRED



EXHIBIT

A

**SECURITY INTEREST: I** give you a security interest in all of the Property described below that I own or have sufficient rights in which to transfer an interest, now or in the future, wherever the Property is or will be located, and all proceeds and products of the Property. "Property" includes all parts, accessories, repairs, replacements, improvements, and accessions to the Property; any original evidence of title or ownership; and all obligations that support the payment or performance of the Property. "Proceeds" includes anything acquired upon the sale, lease, license, exchange, or other disposition of the Property; any rights and claims arising from the Property; and any collections and distributions on account of the Property.

☐ **Accounts and Other Rights to Payment:** All rights to payment, whether or not earned by performance, including, but not limited to, payment for property or services sold, leased, rented, licensed, or assigned. This includes any rights and interests (including all liens) which I have by law or agreement against any account debtor or obligor.

☐ **Inventory:** All inventory held for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in my business.

☐ **Equipment:** All equipment including, but not limited to, machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, office and record keeping equipment, parts, and tools. The Property includes any equipment described in a list or schedule I give to you, but such a list is not necessary to create a valid security interest in all of my equipment.

☐ **Instruments and Chattel Paper:** All instruments, including negotiable instruments and promissory notes and any other writings or records that evidence the right to payment of a monetary obligation, and tangible and electronic chattel paper.

☐ **General Intangibles:** All general intangibles including, but not limited to, tax refunds, patents and applications for patents, copyrights, trademarks, trade secrets, goodwill, trade names, customer lists, permits and franchises, payment intangibles, computer programs and all supporting information provided in connection with a transaction relating to computer programs, and the right to use my name.

☐ **Documents:** All documents of title including, but not limited to, bills of lading, dock warrants and receipts, and warehouse receipts.

☐ **Farm Products and Supplies:** All farm products including, but not limited to, all poultry and livestock and their young, along with their produce, products, and replacements; all crops, annual or perennial, and all products of the crops; and all feed, seed, fertilizer, medicines, and other supplies used or produced in my farming operations.

☐ **Government Payments and Programs:** All payments, accounts, general intangibles, and benefits including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance and diversion payments, production flexibility contracts, and conservation reserve payments under any preexisting, current, or future federal or state government program.

☐ **Investment Property:** All investment property including, but not limited to, certificated securities, uncertificated securities, securities entitlements, securities accounts, commodity contracts, commodity accounts, and financial assets.

☒ **Deposit Accounts:** All deposit accounts including, but not limited to, demand, time, savings, passbook, and similar accounts.

☒ **Specific Property Description:** The Property includes, but is not limited by, the following:
```
ALL FURNITURE FIXTURES, EQUIPMENT, INVENTORY NOW
OWNED OR HEREAFTER ACQUIRED
MORTGAGE DATED 5/31/2005, ON 1251 PINE LAKE
AVE. LAPORTE, IN 46350
```

This agreement covers timber to be cut, the real estate description and record owner information is: _____

_____

The Property will be used for a ☐ personal ☒ business ☐ agricultural ☐ _____ purpose.

Borrower/Owner State of organization/registration (if applicable) _____ INDIANA

## ADDITIONAL TERMS OF THE SECURITY AGREEMENT

**GENERALLY -** This agreement secures this note and any other debt I have with you, now or later. However, it will not secure other debts if you fail to make any required disclosure about this security agreement or if you fail to give any required notice of the right of rescission. If property described in this agreement is located in another state, this agreement may also, in some circumstances, be governed by the law of the state in which the Property is located.

**NAME AND LOCATION -** My name indicated on page 1 is my exact legal name. If I am an individual, my address is my principal residence. If I am an organization registered and registered under state law, my sole place of business. If I am an entity organized and registered under state law, my address is the location of my chief executive offices or sole place of business. If I am an entity organized and registered under state law, my address is located in the state in which I am registered, unless otherwise indicated on page 2. I will provide verification of registration and location upon your request. I will provide you with at least 30 days notice prior to any change in my name, address, or state of organization or registration.

**OWNERSHIP AND DUTIES TOWARD PROPERTY -** I represent that I own all of the Property, or to the extent this is a purchase money security interest I will acquire ownership of the Property with the proceeds of the loan. I will defend it against any other claim. Your claim to the Property is ahead of the claims of any other creditor. I agree to do whatever you require to protect your security interest and to keep your claim in the Property ahead of the claims of other creditors. I will not do anything to harm your position. I will not use the Property for a purpose that will violate any laws or subject the Property to forfeiture or seizure.

I will keep books, records and accounts about the Property and my business in general. I will let you examine these records at any reasonable time. I will prepare any report or accounting you request, which deals with the Property.

I will keep the Property in my possession and will keep it in good repair and use it only for the purpose(s) described on page 1 of this agreement. I will not change that specified use without your express written permission. I represent that I am the original owner of the Property and, if I am not, that I have provided you with a list of prior owners of the Property.

I will keep the Property at my address listed on page 1 of this agreement, unless we agree I may keep it at another location. If the Property is to be used in another state, I will give you a list of those states. I will not try to sell the Property unless it is inventory or I receive your written permission to do so. If I sell the Property I will have the payment payable to the order of you and me.

You may demand immediate payment of the debt(s) if the debtor is not a natural person and without your prior written consent: (1) a beneficial interest in the debtor is sold or transferred, or (2) there is a change in either the identity or number of members of a partnership, or (3) there is a change in ownership of more than 25 percent of the voting stock of a corporation.

I will pay all taxes and charges on the Property as they become due. You have the right of reasonable access in order to inspect the Property. I will immediately inform you of any loss or damage to the Property.

If I fail to perform any of my duties under this security agreement, or any mortgage, deed of trust, lien or other security interest, you may without notice to me perform the duties or cause them to be performed. Your right to perform for me shall not create an obligation to perform and your failure to perform will not preclude you from exercising any of your other rights under the law or this security agreement.

**PURCHASE MONEY SECURITY INTEREST -** For the sole purpose of determining the extent of a purchase money security interest arising under this security agreement: (a) payments on any nonpurchase money loan also secured by this agreement will not be deemed to apply to the Purchase Money Loan, and (b) payments on the Purchase Money Loan will be deemed to apply first to the nonpurchase money portion of the loan, if any, and then to the purchase money obligations in the order in which the items of collateral were acquired or if acquired at the same time, in the order selected by you. No security interest will be terminated by application of this formula. "Purchase Money Loan" means any loan the proceeds of which, in whole or in part, are used to acquire any collateral securing the loan and all extensions, renewals, consolidations and refinancing of such loan.

**PAYMENTS BY LENDER -** You are authorized to pay, on my behalf, charges I am or may become obligated to pay to preserve or protect the secured property (such as property insurance premiums). You may treat those payments as advances and add them to the unpaid principal under the note secured by this agreement or you may demand immediate payment of the amount advanced.

**INSURANCE -** I agree to buy insurance on the Property against the risks and for the amounts you require and to furnish you continuing proof of coverage. I will have the insurance company name you as loss payee on any such policy. You may require added security if you agree that insurance proceeds may be used to repair or replace the Property. I will buy insurance from a firm licensed to do business in the state where you are located. The firm will be reasonably acceptable to you. The insurance will last until the Property is released from this agreement. If I fail to buy or maintain the insurance (or fail to name you as loss payee) you may purchase it yourself.

**WARRANTIES AND REPRESENTATIONS -** If this agreement covers accounts, I will not settle any account for less than its full value without your written permission. I will collect all accounts until you tell me otherwise. I will keep the proceeds from all the accounts and any goods which are returned to me or which I take back in trust for you. I will not mix them with any other property of mine. I will deliver them to you at your request. If you ask me to pay you the full price on any returned items or items retaken by myself, I will do so. You may exercise my rights with respect to obligations of any account debtors, or other persons obligated on the Property, to pay or perform, and you may enforce any security interest that secures such obligations.

If this agreement covers inventory, I will not dispose of it except in my ordinary course of business at the fair market value for the Property, or at a minimum price established between you and me.

<table>
<tr><td>Any person who signs within this box does so to give you a security interest in the Property described on this page. This person does not promise to pay the note. "I" as used in this security agreement will include the borrower and any person who signs within this box.<br><br>Date _____<br><br>Signed _____</td></tr>
</table>

LAPORTE COUNTY RECORDER
BARBARA DEAN

2005R—09333

06/02/2005      01:52:23PM

RECORDING FEE     $34.00
PAGES:  12

LOAN # 6099259

——————— State of Indiana ————————————————Space Above This Line For Recording Data———

# REAL ESTATE MORTGAGE
### (With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is <u>MAY 31, 2005</u> .
The parties and their addresses are:
   MORTGAGOR:   Kwitchurbeliakin LLC
   355 Canterbury Dr
   La Porte IN 46350-1917

   ☐ If checked, refer to the attached Addendum incorporated herein, for additional Mortgagors,
   their signatures and acknowledgments.
   LENDER:

   The LaPorte Savings Bank
   710 Indiana Ave
   La Porte, IN 46350

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is
acknowledged, and to secure the Secured Debt (defined below) and Mortgagor's performance
under this Security Instrument, Mortgagor grants, bargains, conveys, mortgages and warrants to
Lender the following described property:

The property is located in <u>LAPORTE</u> _____ at_____
|                                    (County)                                    |

<u>1251 PINE LAKE AVE</u> , <u>La Porte</u> , Indiana <u>46350-1917</u>
            (Address)                              (City)                                      (Zip Code)

INDIANA - AGRICULTURAL/COMMERCIAL REAL ESTATE SECURITY INSTRUMENT
(NOT FOR FNMA, FHLMC, FHA OR VA USE, AND NOT FOR CONSUMER PURPOSES)                *(page 1 of 9)*
Experã © 1994, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IN 1/7/2003



EXHIBIT
B

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber, all diversion payments or third party payments made to crop producers, all water and riparian rights, wells, ditches, reservoirs, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ _750,000.00_____ . This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
   A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(ies) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. *(When referencing the debts below it is suggested that you include items such as borrowers' names, note amounts, interest rates, maturity dates, etc.)*

   ```
   Loan Dated MAY 31, 2005        In The Amount Of $750,000.00
   With a Maturity Date Of SEPTEMBER 01, 2008
   Said Loan In The Name(s) Of Kwitchurbeliakin LLC
   ```

   B. All future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt existing now or executed after this Security Instrument whether or not this Security Instrument is specifically referenced. If more than one person signs this Security Instrument, each Mortgagor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Mortgagor, or any one or more Mortgagor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.
   C. All obligations Mortgagor owes to Lender, which now exist or may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Mortgagor and Lender.
   D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.
   This Security Instrument will not secure any other debt if Lender fails to give any required notice of the right of rescission.

5. **PAYMENTS.** Mortgagor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

6. **WARRANTY OF TITLE.** Mortgagor warrants that Mortgagor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to grant, bargain, convey, sell, mortgage and warrant the Property. Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.

7. **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:
   A. To make all payments when due and to perform or comply with all covenants.
   B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.
   C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

8. **CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to

*(page 2 of 9)*

Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

9. **DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Security Instrument is released.

10. **TRANSFER OF AN INTEREST IN THE MORTGAGOR.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Lender may demand immediate payment if:
    A. A beneficial interest in Mortgagor is sold or transferred.
    B. There is a change in either the identity or number of members of a partnership or similar entity.
    C. There is a change in ownership of more than 25 percent of the voting stock of a corporation or similar entity.

    However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Security Instrument.

11. **ENTITY WARRANTIES AND REPRESENTATIONS.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Mortgagor makes to Lender the following warranties and representations which shall continue as long as the Secured Debt remains outstanding:
    A. Mortgagor is duly organized and validly existing in Mortgagor's state of incorporation or organization. Mortgagor is in good standing in all states in which Mortgagor transacts business. Mortgagor has the power and authority to own the Property and to carry on its business as now being conducted and, as applicable, is qualified to do so in each state in which Mortgagor operates.
    B. The execution, delivery and performance of this Security Instrument by Mortgagor and the obligations evidenced by the Secured Debt are within the power of Mortgagor, have been duly authorized, have received all necessary governmental approval, and will not violate any provision of law, or order of court or governmental agency.
    C. Other than previously disclosed in writing to Lender, Mortgagor has not changed its name within the last ten years and has not used any other trade or fictitious name. Without Lender's prior written consent, Mortgagor does not and will not use any other name and will preserve its existing name, trade names and franchises until the Secured Debt is satisfied.

12. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor shall not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor, and of any loss or damage to the Property.

No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Security Instrument. Mortgagor shall not partition or subdivide the Property without Lender's prior written consent.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Mortgagor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

13. **AUTHORITY TO PERFORM.** If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps

Express™ © 1994, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IN 1/7/2003

necessary to protect Lender's security interest in the Property, including completion of the construction.

14. **ASSIGNMENT OF LEASES AND RENTS.** Mortgagor assigns, grants, bargains, conveys, mortgages and warrants to Lender as additional security all the right, title and interest in the following (Property).

   A. Existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including but not limited to, any extensions, renewals, modifications or replacements (Leases).

   B. Rents, issues and profits, including but not limited to, security deposits, minimum rents, percentage rents, additional rents, common area maintenance charges, parking charges, real estate taxes, other applicable taxes, insurance premium contributions, liquidated damages following default, cancellation premiums, "loss of rents" insurance, guest receipts, revenues, royalties, proceeds, bonuses, accounts, contract rights, general intangibles, and all rights and claims which Mortgagor may have that in any way pertain to or are on account of the use or occupancy of the whole or any part of the Property (Rents).

In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement.

Mortgagor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default. Mortgagor will not collect in advance any Rents due in future lease periods, unless Mortgagor first obtains Lender's written consent. Upon default, Mortgagor will receive any Rents in trust for Lender and Mortgagor will not commingle the Rents with any other funds. When Lender so directs, Mortgagor will endorse and deliver any payments of Rents from the Property to Lender. Amounts collected will be applied at Lender's discretion to the Secured Debts, the costs of managing, protecting and preserving the Property, and other necessary expenses. Mortgagor agrees that this Security Instrument is immediately effective between Mortgagor and Lender and effective as to third parties on the recording of this Assignment.

As long as this Assignment is in effect, Mortgagor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants. Mortgagor, at its sole cost and expense, will keep, observe and perform, and require all other parties to the Leases to comply with the Leases and any applicable law. If Mortgagor or any party to the Lease defaults or fails to observe any applicable law, Mortgagor will promptly notify Lender. If Mortgagor neglects or refuses to enforce compliance with the terms of the Leases, then Lender may, at Lender's option, enforce compliance.

Mortgagor will not sublet, modify, extend, cancel, or otherwise alter the Leases, or accept the surrender of the Property covered by the Leases (unless the Leases so require) without Lender's consent. Mortgagor will not assign, compromise, subordinate or encumber the Leases and Rents without Lender's prior written consent. Lender does not assume or become liable for the Property's maintenance, depreciation, or other losses or damages when Lender acts to manage, protect or preserve the Property, except for losses and damages due to Lender's gross negligence or intentional torts. Otherwise, Mortgagor will indemnify Lender and hold Lender harmless for all liability, loss or damage that Lender may incur when Lender opts to exercise any of its remedies against any party obligated under the Leases.

15. **LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** Mortgagor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

16. **DEFAULT.** Mortgagor will be in default if any of the following occur:

   A. Any party obligated on the Secured Debt fails to make payment when due;

   B. A breach of any term or covenant in this Security Instrument or any other document executed for the purpose of creating, securing or guarantying the Secured Debt;

   C. The making or furnishing of any verbal or written representation, statement or warranty to Lender that is false or incorrect in any material respect by Mortgagor or any person or entity obligated on the Secured Debt;

   D. The death, dissolution, or insolvency of, appointment of a receiver for, or application of any debtor relief law to, Mortgagor or any other person or entity obligated on the Secured Debt;

Experi® © 1994, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IN 1/7/2003

E. A good faith belief by Lender at any time that Lender is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment is impaired or the value of the Property is impaired;

F. A material adverse change in Mortgagor's business including ownership, management, and financial conditions, which Lender in its opinion believes impairs the value of the Property or repayment of the Secured Debt; or

G. Any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

**17. REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Mortgagor is in default.

At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the terms of the Secured Debt, this Security Instrument and any related documents. All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

**18. EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Mortgagor agrees to pay all of Lender's expenses if Mortgagor breaches any covenant in this Security Instrument. Mortgagor will also pay on demand any amount incurred by Lender for insuring, inspecting, preserving or otherwise protecting the Property and Lender's security interest. These expenses will bear interest from the date of the payment until paid in full at the highest interest rate in effect as provided in the terms of the Secured Debt. Mortgagor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. This Security Instrument shall remain in effect until released. Mortgagor agrees to pay for any recordation costs of such release.

**19. ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

Mortgagor represents, warrants and agrees that:

A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

C. Mortgagor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.

D. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law.

Expert™ © 1994, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IN 1/7/2003

Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

E. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are and shall remain in full compliance with any applicable Environmental Law.

F. Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

G. Mortgagor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

H. Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

I. Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

J. Lender has the right, but not the obligation, to perform any of Mortgagor's obligations under this section at Mortgagor's expense.

K. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Security Instrument and in return Mortgagor will provide Lender with collateral of at least equal value to the Property secured by this Security Instrument without prejudice to any of Lender's rights under this Security Instrument.

L. Notwithstanding any of the language contained in this Security Instrument to the contrary, the terms of this section shall survive any foreclosure or satisfaction of this Security Instrument regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

20. **CONDEMNATION.** Mortgagor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

21. **INSURANCE.** Mortgagor agrees to maintain insurance as follows:

A. Mortgagor shall keep the Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Mortgagor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Mortgagor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Mortgagor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Mortgagor.

*(page 6 of 9)*

Unless otherwise agreed in writing, all insurance proceeds shall be applied to restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of scheduled payment nor change the amount of any payment. Any excess will be paid to the Mortgagor. If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

B. Mortgagor agrees to maintain comprehensive general liability insurance naming Lender as an additional insured in an amount acceptable to Lender, insuring against claims arising from any accident or occurrence in or on the Property.

C. Mortgagor agrees to maintain rental loss or business interruption insurance, as required by Lender, in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing), under a form of policy acceptable to Lender.

22. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

23. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and Lender's lien status on the Property.

24. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Mortgagor signs this Security Instrument but does not sign an evidence of debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. Mortgagor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Security Instrument. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Mortgagor and Lender.

25. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Security Instrument is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

26. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one mortgagor will be deemed to be notice to all mortgagors.

27. **WAIVERS.** Except to the extent prohibited by law, Mortgagor waives and releases any and all rights and remedies Mortgagor may now have or acquire in the future relating to redemption, reinstatement, and the marshalling of liens and assets. Mortgagor waives all rights of valuation and appraisement.

28. **U.C.C. PROVISIONS.** If checked, the following are applicable to, but do not limit, this Security Instrument:

☐ **Construction Loan.** This Security Instrument secures an obligation incurred for the construction of an improvement on the Property.

☒ **Fixture Filing.** Mortgagor grants to Lender a security interest in all goods that Mortgagor owns now or in the future and that are or will become fixtures related to the Property.

*(page 7 of 9)*

☐ **Crops; Timber; Minerals; Rents, Issues and Profits.** Mortgagor grants to Lender a security interest in all crops, timber and minerals located on the Property as well as all rents, issues, and profits of them including, but not limited to, all Conservation Reserve Program (CRP) and Payment in Kind (PIK) payments and similar governmental programs (all of which shall also be included in the term "Property"). Lender may file a financing statement signed by Lender instead of Mortgagor with appropriate public officials.

☒ **Personal Property.** Mortgagor grants to Lender a security interest in all personal property located on or connected with the Property, including all farm products, inventory, equipment, accounts, documents, instruments, chattel paper, general intangibles, and all other items of personal property Mortgagor owns now or in the future and that are used or useful in the construction, ownership, operation, management, or maintenance of the Property (all of which shall also be included in the term "Property"). The term "personal property" specifically excludes that property described as "household goods" secured in connection with a "consumer" loan as those terms are defined in applicable federal regulations governing unfair and deceptive credit practices. Lender may file a financing statement signed by Lender instead of Mortgagor with appropriate public officials.

☐ **Filing As Financing Statement.** Mortgagor agrees and acknowledges that this Security Instrument also suffices as a financing statement and any carbon, photographic or other reproduction may be filed of record for purposes of Article 9 of the Uniform Commercial Code.

**29. OTHER TERMS.** If checked, the following are applicable to this Security Instrument:

☐ **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

☐ **Separate Assignment.** The Mortgagor has executed or will execute a separate assignment of leases and rents. If the separate assignment of leases and rents is properly executed and recorded, then the separate assignment will supersede this Security Instrument's "Assignment of Leases and Rents" section.

☐ **Additional Terms.**

**SIGNATURES:** By signing below, Mortgagor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Mortgagor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

Entity Name: KWITCHURBELIAKIN LLC                    Entity Name: _____

_____ 5/31/05        _____ VICE President 5/31/05
(Signature)                     (Date)         (Signature)                     (Date)
LUISE MARIE LESSER, PRESIDENT                  TODD A APFEL, VICE PRESIDENT

_____                        _____
(Signature)                     (Date)         (Signature)                     (Date)

## ACKNOWLEDGMENT:

**(Individual)**

STATE OF _____ , COUNTY OF_____ } ss.

Before me, _____ , a Notary Public this _____t day of

_____ , _____

_____ acknowledged the execution of the annexed mortgage.

My commission expires:

(Notary Public) _____

(Notary's County) _____

**(Business or Entity Acknowledgment)**

STATE OF  INDIANA  , COUNTY OF  LA PORTE  } ss.

Before me,  TONIA L CHIZAR  , a Notary Public this  31st  day of

MAY  2005  ,  LUISE MARIE LESSER, PRES. & TODD A APFEL, VICE PRES.

_____ (Titles)

of  KWITCHURBELIAKIN LLC  (Name of Business Entity)

a  LIMITED LIABILITY COMPANY  acknowledged the execution of the

annexed mortgage of the business or entity.

My commission expires: 09/13/10

(Notary Public) *Tonia R. Chizar*
TONIA L CHIZAR

(Notary's County) LA PORTE

This instrument was prepared by (name, address): The LaPorte Savings Bank
710 Indiana Ave
La Porte, IN 46350

(page 9 of 9)

Expero™ © 1994, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-IN  1/7/2003

Commitment No.: **57650LP**

## DESCRIPTION:

### PARCEL #1

A parcel of land lying in the Northeast Quarter (NE¼) of Section Twenty-seven (27), Township Thirty-seven (37) North, Range Three (3) West, LaPorte County, Indiana, more particularly described as follows:

Starting at a bolt marking the Northeast corner of Section Twenty-seven (27); thence South Eighty-nine degrees Fifty-seven minutes West (S 89° 57' W) along the North line of said Section, a distance of Three hundred Thirty-two (332) feet to an iron pipe; thence South Six degrees Thirty-five minutes East (S 06° 35' E), a distance of Five hundred Twenty-six and Eleven hundredths (526.11) feet to an iron pipe; thence South Seventy-three degrees Three minutes East (S 73° 03' E), a distance of Ninety-five and Seventy hundredths (95.70) feet to an iron pipe on the West right-of-way line of State Road #39; thence South Twenty degrees Twenty-one minutes West (S 20° 21' W) along said right-of-way line, a distance of One hundred Forty-five and Forty-two hundredths (145.42) feet to the point of curvature of a curve, said curve having a degree of curvature of Six degrees Thirty minutes (06° 30') on the centerline of said Road, a central angle of Nineteen degrees Forty six minutes (19° 46') a tangent length on the centerline of the Road of One hundred Fifty-three and Sixty hundredths (153.60) feet, a curve length of Three hundred Four and Ten hundredths (304.10) feet and an external distance of Thirteen and Thirty hundredths (13.30) feet; thence South Twenty degrees Twenty-one minutes West (S 20° 21' W), a distance of One hundred Sixty-five and Ninety-three hundredths (165.93) feet on a tangent to the curved right-of-way line of said Road to the point of intersection of said tangents; thence South Zero degrees Thirty-five minutes West (S 00° 35' W), a distance of One hundred Sixty-five and Ninety-three hundredths (165.93) feet on a tangent to said curved right-of-way to the point of tangency of said curve; thence South Zero degrees Thirty-five minutes West (S 00° 35' W), a distance of One hundred Twelve and Fifty-seven hundredths (112.57) feet along said right-of-way to the intersection of the Northerly right-of-way of U. S. Highway #35; thence North Fifty-two degrees Fifty-seven minutes West (N 52° 57' W), a distance of One hundred Thirteen and Sixty-six hundredths (113.66) feet on a tangent to the curved right-of-way of said Highway to the point of intersection of said tangents, said curve having a degree of curvature of Three degrees Forty-five minutes (03° 45') on the centerline of the Road; thence North Sixty-two degrees Forty-one minutes West (N 62° 41' W), a distance of One hundred Seventy-six and Thirty-four hundredths (176.34) feet on the tangent to said curved right-of-way to an iron pipe for a point of beginning; thence North Sixty-two degrees Forty-one minutes West (N 62° 41' W), a distance of Twenty-one and Ninety-six hundredths (21.96) feet on the tangent to said curved right-of-way to the point of tangency of said curve; thence North Sixty-two degrees Forty-one minutes West (N 62° 41' W), a distance of Two hundred Fifty-six and Four hundredths (256.04) feet to an iron pipe; thence North Twenty-seven degrees Fourteen minutes East (N 27° 14' E), a distance of Four hundred (400) feet to an iron pipe; thence South Sixty-two degrees Forty-one minutes East (S 62° 41' E), a distance of Two hundred Seventy-eight (278) feet to an iron pipe; thence South Twenty-seven degrees Fourteen minutes

containing Two and Five hundred Fifty-three thousandths (2.553) acres, more or less.

EXCEPT:

A part of the Northeast Quarter (NE¼) of Section Twenty-seven (27), Township Thirty-seven (37) North, Range Three (3) West, LaPorte County, Indiana, described as follows: Commencing at the Northeast corner of said Section; thence South Eighty-eight degrees Fifty minutes Thirty-seven seconds West (S 88° 50' 37" W), a distance of Three hundred Thirty-two (332.00) feet along the North line of said Section; thence South Seven degrees Forty-one minutes Twenty-three seconds East (S 07° 41' 23" E), a distance of Five hundred Twenty-six and Eleven hundredths (526.11) feet; thence South Seventy-four degrees Nine minutes Twenty-three seconds East (S 74° 09' 23" E), a distance of Ninety-five and Seventy hundredths (95.701) feet to the Western boundary of State Road #39; thence South Nineteen degrees Fourteen minutes Thirty-seven seconds West (S 19° 14' 37" W), a distance of One hundred Forty-five and Forty-two hundredths (145.42) feet along the boundary of said State Road #39; thence South Nineteen degrees Fourteen minutes Thirty-seven seconds West (S 19° 14' 37" W), a distance of One hundred Sixty-five and Ninety-three hundredths (165.93) feet; thence South Zero degrees Thirty-one minutes Twenty-three seconds East (S 00° 31' 23" E), a distance of One hundred Sixty-five and Ninety-three hundredths (165.93) feet to the Western boundary of said State Road #39; thence South Zero degrees Thirty-one minutes Twenty-three seconds East (S 00° 31' 23" E), a distance of One hundred Twelve and Fifty-seven hundredths (112.57) feet along the boundary of said State Road #39; thence North Fifty-four degrees Three minutes Twenty-three seconds West (N 54° 03' 23" W), a distance of One hundred Thirteen and Sixty-six hundredths (113.66) feet; thence North Sixty-three degrees Forty-nine minutes Twenty-five seconds West (N 63° 49' 25" W), a distance of One hundred Seventy-six and Thirty-four hundredths (176.34) feet to the Southeastern line of the owner's land; thence South Twenty-six degrees Seven minutes Thirty-seven seconds West (S 26° 07' 37" W), a distance of Nineteen and Ninety hundredths (19.90) feet along the Southeastern line to the centerline of U. S. R. #35 (also known as Pine Lake Avenue) and the South corner of the owner's land; thence North Sixty-three degrees Forty-seven minutes Twenty-three seconds West (N 63° 47' 23" W), a distance of Two hundred Seventy-eight (278.00) feet along the centerline to the West corner of the owner's land; thence North Twenty-six degrees Seven minutes Thirty-seven seconds East (N 26° 07' 37" E), a distance of Forty and Twelve hundredths (40.12) feet along the Northwestern line of the owner's land; thence South Sixty-five degrees Fifty-five minutes Thirty-eight seconds East (S 65° 55' 38" E), a distance of One hundred Thirty-eight and Ninety-three hundredths (138.93) feet; thence South Seventy-two degrees Thirty-six minutes Thirty-nine seconds East (S 72° 36' 39" E),

Schedule A

**Schedule A Continued:**

Commitment No.: 57650LP

distance of Sixty-five and Seventy-six hundredths (65.76) feet; thence South Sixty-three degrees Twenty-seven minutes Forty seconds East (S 63° 27' 40" E), a distance of Seventy-four and Sixteen hundredths (74.16) feet to the Southeastern line of the owner's land; thence South Twenty-six degrees Seven minutes Thirty-seven seconds West (S 26° 07' 37" W), a distance of Thirty-five and Seven hundredths (35.07) feet along said Southeastern line to the point of beginning and containing Three hundred Five thousandths (0.305) acre, more or less. The portion of the above described real estate which is not already embraced within public rights of way contains One hundred Seventy-eight thousandths (0.178) acre, more or less.

| | | |
|---|---|---|
| Kwitchurbeliakin LLC<br>935 Canterbury Dr.<br>La Porte IN 46350-1917 | The LaPorte Savings Bank<br>710 Indiana Ave<br>La Porte, IN 46350 | Loan Number ___6010056___<br>Date _____ 11/10/05<br>Maturity Date _____ 11/10/08<br>Loan Amount $ _____ 75,000.00<br>Renewal Of _____ |
| **BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and severally. | **LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | |

For value received, I promise to pay to you, or your order, at your address listed above the **PRINCIPAL** sum of _____
Seventy five thousand & no/100 _____ Dollars $ 75,000.00 _____

☒ **Single Advance:** I will receive all of this principal sum on ___11/10/05___ . No additional advances are contemplated under this note.

☐ **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On _____
     I will receive the amount of $ _____ and future principal advances are contemplated.
     **Conditions:** The conditions for future advances are _____
_____

     ☐ **Open End Credit:** You and I agree that I may borrow up to the maximum amount of principal more than one time. This feature is subject to
       all other conditions and expires on _____ .

     ☐ **Closed End Credit:** You and I agree that I may borrow up to the maximum only one time (and subject to all other conditions).

**INTEREST:** I agree to pay interest on the outstanding principal balance from ___11/10/05___ at the rate of ___8.0000___ % per year until
the first schedule rate change - 12/01/05

☒ **Variable Rate:** This rate may then change as stated below.
     ☒ **Index Rate:** The future rate will be ___1.000% Above___ the following index rate: _____
       THE HIGHEST PRIME RATE AS STATED IN THE MONEY RATES TABLE IN THE
       WALL STREET JOURNAL
     ☐ **No Index:** The future rate will not be subject to any internal or external index. It will be entirely in your control.
     ☒ **Frequency and Timing:** The rate on this note may change as often as ___Monthly___ .
       A change in the interest rate will take effect on the first day of each month.    (If The Index Changes)
     ☒ **Limitations:** During the term of this loan, the applicable annual interest rate will not be more than ___21.0000___ % or less than
       ___5.0000___ %. The rate may not change more than ___5.0000___ % each ___Month___ .
     **Effect of Variable Rate:** A change in the interest rate will have the following effect on the payments:
     ☐ The amount of each scheduled payment will change.     ☒ The amount of the final payment will change.
     ☐ _____

**ACCRUAL METHOD:** Interest will be calculated on a ___Actual/365___ basis.

**POST MATURITY:** Interest will be pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:
     ☒ on the same fixed or variable rate basis in effect before maturity (as indicated above).
     ☐ at a rate equal to _____

☒ **LATE CHARGE:** If a payment is made more than ___10___ days after it is due, I agree to pay a late charge of _____
     5.000% OF THE PAYMENT

☐ **ADDITIONAL CHARGES:** In addition to interest, I agree to pay the following charges which ☐ are    ☐ are not   included in the principal
     amount above: _____ .

**PAYMENTS:** I agree to pay this note as follows:
☐ **Interest:** I agree to pay accrued interest _____
_____

☐ **Principal:** I agree to pay the principal _____
_____

☒ **Installments:** I agree to pay this note in ___36___ payments. The first payment will be in the amount of $ _716.86_____
and will be due ___DECEMBER 10, 2005___ . A payment of $ 716.86 _____ will be due _____
___on the 10th day of each month_____ thereafter. The final payment of the entire
unpaid balance of principal and interest will be due ___NOVEMBER 10, 2008___ .

☐ **Unpaid Interest:** Any accrued interest not paid when due (whether due by reason of a schedule of payments or due because of Lender's demand)
     will become part of the principal thereafter, and will bear interest at the interest rate in effect from time to time as provided for in this
     agreement.

**ADDITIONAL TERMS:** ANNUAL FINANCIAL STATEMENT AND TAX RETURNS TO BE PROVIDED TO THE
       LAPORTE SAVINGS BANK

| | |
|---|---|
| ☒ **SECURITY:** This note is separately secured by (describe separate document by type and date):<br>MORTGAGE DATED 11/10/2005 ON 1251 PINE LAK AVE AND 2525 E 850 N LAPORTE, IN<br><br>(This section is for your internal use. Failure to list a separate security document does not mean the agreement will not secure this note.) | **PURPOSE:** The purpose of this loan is _____<br>END LOAN OF BUSINESS PURCHASE _____ .<br>**SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE (INCLUDING THOSE ON PAGE 2).** I have received a copy on today's date.<br>Kwitchurbeliakin LLC<br>_Luise Lesser President_<br>LUISE LESSER, PRESIDENT<br>_Todd A. Appel Vice President_<br>TODD A APFEL, VICE PRESIDENT |

Signature for Lender

The LaPorte Savings Bank

RUSSELL KLOSINSKI
EXEC VICE PRESIDENT

**EXHIBIT**

C

FINITIONS: As used on page 1, "☒" means the terms that apply to ; loan. "I," "me" or "my" means each Borrower who signs this note I each other person or legal entity (including guarantors, endorsers, I sureties) who agrees to pay this note (together referred to as "us"). )u" or "your" means the Lender and its successors and assigns. PLICABLE LAW: The law of the state of Indiana will govern this note. y term of this note which is contrary to applicable law will not be active, unless the law permits you and me to agree to such a variation. ony provision of this agreement cannot be enforced according to its ms, this fact will not affect the enforceability of the remainder of this eement. No modification of this agreement may be made without your press written consent. Time is of the essence in this agreement. MMISSIONS OR OTHER REMUNERATION: I understand and agree that y insurance premiums paid to insurance companies as part of this note I involve money retained by you or paid back to you as commissions or er remuneration.

In addition, I understand and agree that some other payments to third rties as part of this note may also involve money retained by you or id back to you as commissions or other remuneration. YMENTS: Each payment I make on this note will first reduce the iount I owe you for charges which are neither interest nor principal. e remainder of each payment will then reduce accrued unpaid interest, d then unpaid principal. If you and I agree to a different application of yments, we will describe our agreement on this note. I may prepay a rt of, or the entire balance of this loan without penalty, unless the ecify to the contrary on this note. Any partial prepayment will not cuse or reduce any later scheduled payment until this note is paid in full iless, when I make the prepayment, you and I agree in writing to the ntrary).

TEREST: Interest accrues on the principal remaining unpaid from time time, until paid in full. If I receive the principal in more than one vance, each advance will start to earn interest only when I receive the vance. The interest rate in effect on this note at any given time will ply to the entire principal advanced at that time. You and I may provide this agreement for accrued interest not paid when due to be added to incipal. Notwithstanding anything to the contrary, I do not agree to pay d you do not intend to charge any rate of interest that is higher than e maximum rate of interest you could charge under applicable law for e extension of credit that is agreed to here (either before or after aturity). If any notice of interest accrual is sent and is in error, we utually agree to correct it, and if you actually collect more interest than lowed by law and this agreement, you agree to refund it to me. DEX RATE: The index will serve only as a device for setting the rate on is note. You do not guarantee by selecting this index, or the margin, at the rate on this note will be the same rate you charge on any other ans or class of loans to me or other borrowers. CCRUAL METHOD: The amount of interest that I will pay on this loan ill be calculated using the interest rate and accrual method stated on age 1 of this note. For the purpose of interest calculation, the accrual ethod will determine the number of days in a "year." If no accrual ethod is stated, then you may use any reasonable accrual method for alculating interest. OST MATURITY RATE: For purposes of deciding when the "Post aturity Rate" (shown on page 1) applies, the term "maturity" means the ate of the last scheduled payment indicated on page 1 of this note or e date you accelerate payment on the note, whichever is earlier. INGLE ADVANCE LOANS: If this is a single advance loan, you and I xpect that you will make only one advance of principal. However, you ay add other amounts to the principal if you make any payments escribed in the "PAYMENTS BY LENDER" paragraph below, or if we ave agreed that accrued interest not paid when due may be added to rincipal. 1ULTIPLE ADVANCE LOANS: If this is a multiple advance loan, you and I xpect that you will make more than one advance of principal. If this is losed end credit, repaying a part of the principal will not entitle me to dditional credit. AYMENTS BY LENDER: If you are authorized to pay, on my behalf, harges I am obligated to pay (such as property insurance premiums), hen you may treat those payments made by you as advances and add hem to the unpaid principal under this note, or you may demand nmediate payment of the charges. :ET-OFF: I agree that you may set off any amount due and payable under his note against any right I have to receive money from you.

"Right to receive money from you" means: (1) any deposit account balance I have with you; (2) any money owed to me on an item presented to you or in your possession for collection or exchange; and (3) any repurchase agreement or other nondeposit obligation. "Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of his note at the time you set off. This total includes any balance the due fate for which you properly accelerate under this note.

If my right to receive money from you is also owned by someone who ias not agreed to pay this note, your right of set-off will apply to my nterest in the obligation and to any other amounts I could withdraw on ny sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of my accounts. I agree

to hold you harmless from any such claims arising, as a result of your exercise of your right of set-off. REAL ESTATE OR RESIDENCE SECURITY: If this note is secured by real estate or a residence that is personal property, the existence of a default and your remedies for such a default will be determined by applicable law, by the terms of any separate instrument creating the security interest and, to the extent not prohibited by law and not contrary to the terms of the separate security instrument, by the "Default" and "Remedies" paragraphs herein. DEFAULT: I will be in default if any one or more of the following occur (1) I fail to make a payment on time or in the amount due; (2) I fail to keep the property insured, if required; (3) I fail to pay, or keep any promise, on any debt or this agreement; (4) any other creditor of mine attempts to collect any debt I owe him through court proceedings; (5) I die, am declared incompetent, make an assignment for the benefit of creditors, or become insolvent (either because my liabilities exceed my assets or I am unable to pay my debts as they become due); (6) I make any written statement or provide any financial information that is untrue or inaccurate at the time it was provided; (7) I do or fail to do something which causes you to believe that you will have difficulty collecting the amount I owe you; (8) any collateral securing this note is used in a manner or for a purpose which threatens confiscation by a legal authority; (9) I change my name or assume an additional name without first notifying you before making such a change; (10) I fail to plant, cultivate and harvest crops in due season; (11) any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M. REMEDIES: If I am in default on this note you have, but are not limited to, the following remedies:

(1) You may demand immediate payment of all I owe you under this note (principal, accrued unpaid interest and other accrued charges). (2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "Set-Off" paragraph herein. (3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not using any other remedy. (4) You may refuse to make advances to me or allow purchases on credit by me. (5) You may use any remedy you have under state or federal law.

By selecting any one or more of these remedies you do not give up your right to later use any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to later consider the event as a default if it continues or happens again. COLLECTION COSTS AND ATTORNEY'S FEES: I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code. WAIVER: I give up my rights to require you to do certain things. I will not require you to:

(1) demand payment of amounts due (presentment); (2) obtain official certification of nonpayment (protest); or (3) give notice that amounts due have not been paid (notice of dishonor).

I waive any defenses I have based on suretyship or impairment of collateral. I also give up any rights I may have under any valuation and appraisement laws which apply to me. OBLIGATIONS INDEPENDENT: I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may do so without any notice that it has not been paid (notice of dishonor). You may without notice release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not release me from my duty to pay it. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit or notice and for any term without affecting my liability for payment of the note. I will not assign my obligation under this agreement without your prior written approval. FINANCIAL INFORMATION: I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete. NOTICE: Unless otherwise required by law, any notice to me shall be given by delivering it or by mailing it by first class mail addressed to me at my last known address. My current address is on page 1. I agree to inform you in writing of any change in my address. I will give any notice to you by mailing it first class to your address stated on page 1 of this agreement, or to any other address that you have designated.

| DATE OF TRANSACTION | PRINCIPAL ADVANCE | BORROWER'S INITIALS (not required) | PRINCIPAL PAYMENTS | PRINCIPAL BALANCE | INTEREST RATE | INTEREST PAYMENTS | INTEREST PAID THROUGH: |
|---|---|---|---|---|---|---|---|
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |

*(page 2 of 2)*

If this agreement covers farm products I will provide you, at your request and feasible, a list of the buyers, commission merchants or selling agents to or through whom I may sell my farm products. In addition to those parties named on this written list, I authorize you to notify at your sole discretion any additional parties regarding your security interest in my farm products. I remain subject to all applicable penalties for selling my farm products in violation of my agreement with you and the Food Security Act. In this paragraph the terms farm products, buyers, commission merchants and selling agents have the meanings given to them in the Federal Food Security Act of 1985.

If this agreement covers chattel paper or instruments, either as original collateral or proceeds of the Property, I will note your interest on the face of the chattel paper or instruments.

**REMEDIES** - I will be in default on this security agreement if I am in default on any note this agreement secures or if I fail to keep any promise contained in the terms of this agreement. If I default, you have all of the rights and remedies provided in the note and under the Uniform Commercial Code. You may require me to make the secured property available to you at a place which is reasonably convenient. You may take possession of the secured property and sell it as provided by law. The proceeds will be applied first to your expenses and then to the debt. I agree that 10 days written notice sent to my last known address by first class mail will be reasonable notice under the Uniform Commercial Code. My current address is on page 1.

**PERFECTION OF SECURITY INTEREST** - I authorize you to file a financing statement covering the Property. I will comply with, facilitate, and otherwise assist you in connection with obtaining possession of or control over the Property for purposes of perfecting your security interest under the Uniform Commercial Code.

## ADDITIONAL TERMS OF THE NOTE

**DEFINITIONS** - As used on pages 1 and 2, "I," "me" or "my" means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

**APPLICABLE LAW** - The law of the state of Indiana will govern this agreement. Any term of this agreement which is contrary to applicable law will not be effective, unless the law permits you and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

**PAYMENTS** - Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe our agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary).

**INTEREST** - Interest accrues on the principal remaining unpaid from time to time, until paid in full. If I receive the principal in more than one advance, each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal sum outstanding at that time. You and I may provide in this agreement for accrued interest not paid when due to be added to principal. Notwithstanding anything to the contrary, I do not agree to pay and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to in this note (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it, and if you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

**INDEX RATE** - The index will serve only as a device for setting the interest rate on this note. You do not guarantee by selecting this index, or the margin, that the interest rate on this note will be the same rate you charge on any other loans or class of loans you make to me or other borrowers.

**POST MATURITY RATE** - For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 of this note or the date you accelerate payment on the note, whichever is earlier.

**SINGLE ADVANCE LOANS** - If this is a single advance loan, you and I expect that you will make only one advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph on page 2, or if we have agreed that accrued interest not paid when due may be added to principal.

**MULTIPLE ADVANCE LOANS** - If this is a multiple advance loan, you and I expect that you will make more than one advance of principal. If this is closed end credit, repaying a part of the principal will not entitle me to additional credit.

**SET-OFF** - I agree that you may set off any amount due and payable under this note against any right I have to receive money from you.
"Right to receive money from you" means:
(1) any deposit account balance I have with you;

(2) any money owed to me on an item presented to you or in your possession for collection or exchange; and
(3) any repurchase agreement or other nondeposit obligation.

"Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set off. This total includes any balance the due date for which you properly accelerate under this note.

If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of my accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right to set-off.

**DEFAULT** - I will be in default if any one or more of the following occur: (1) I fail to make a payment on time or in the amount due; (2) I fail to keep the Property insured, if required; (3) I fail to pay, or keep any promise, on any debt or agreement I have with you; (4) any other creditor of mine attempts to collect any debt I owe him through court proceedings; (5) I die, am declared incompetent, make an assignment for the benefit of creditors, or become insolvent (either because my liabilities exceed my assets or I am unable to pay my debts as they become due); (6) I make any written statement or provide any financial information that is untrue or inaccurate at the time it was provided; (7) I do or fail to do something which causes you to believe you will have difficulty collecting the amount I owe you; (8) any collateral securing this note is used in a manner or for a purpose which threatens confiscation by a legal authority; (9) I change my name or assume an additional name without first notifying you before making such a change; (10) I fail to plant, cultivate and harvest crops in due season; (11) any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

**REMEDIES** - If I am in default on this note you have, but are not limited to, the following remedies:
(1) You may demand immediate payment of all I owe you under this note (principal, accrued unpaid interest and other accrued unpaid charges).
(2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "SET-OFF" paragraph herein.
(3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not using any other remedy.
(4) You may refuse to make advances to me or allow purchases on credit by me.
(5) You may use any remedy you have under state or federal law.
(6) You may make use of any remedy given to you in any agreement securing this note.

By selecting any one or more of these remedies you do not give up your right to use later any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to consider later the event a default if it continues or happens again.

**COLLECTION COSTS AND ATTORNEY'S FEES** - I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER** - I give up my rights to require you to do certain things. I will not require you to:
(1) demand payment of amounts due (presentment);
(2) obtain official certification of nonpayment (protest); or
(3) give notice that amounts due have not been paid (notice of dishonor).

I waive any defenses I have based on suretyship or impairment of collateral. I also give up any rights I may have under any valuation and appraisement laws which apply to me.

**OBLIGATIONS INDEPENDENT** - I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may without notice release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not release me from my duty to pay it. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit or notice and for any term without affecting my liability for payment of the note. I will not assign my obligation under this agreement without your prior written approval.

**FINANCIAL INFORMATION** - I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, current and complete.

**SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE (INCLUDING THOSE ON PAGES 1, 2 AND 3). I** have received a copy on today's date.

Kwitchurbeliakin LLC

_____
LUISE MARIE LESSER, PRESIDENT

_____
TODD A APFEL, VICE PRESIDENT

_____

_____

SIGNATURE FOR LENDER: _____
RUSSELL KLOSINSKI
EXEC VICE PRESIDENT

Experts © 1984, 1991 Bankers Systems, Inc., St. Cloud, MN Form UNS-LAZ-IN 12/19/2000

| Kwitchurbeliakin L.L.C.<br>355 Canterbury Dr<br>La Porte IN 46350-1917 | The LaPorte Savings Bank<br>2000 Franklin Street<br>Michigan City, IN 46360 | Loan Number ___ 6113363<br>Date _____ 03/25/09<br>Maturity Date _____ 03/25/11<br>Loan Amount $ ___ 67,737.92<br>Renewal Of ___ 6010056 |
|---|---|---|
| **BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and severally. | **LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | |

For value received, I promise to pay to you, or your order, at your address listed above the **PRINCIPAL** sum of _____

Sixty seven thousand seven hundred thirty seven & 92/100 _____ Dollars $ 67,737.92 _____

☒ **Single Advance:** I will receive all of this principal sum on ___ 03/25/09 ___ . No additional advances are contemplated under this note.

☐ **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On _____

    I will receive the amount of $ _____ and future principal advances are contemplated.

    Conditions: The conditions for future advances are _____

    ☐ **Open End Credit:** You and I agree that I may borrow up to the maximum amount of principal more than one time. This feature is subject to

        all other conditions and expires on _____ .

    ☐ **Closed End Credit:** You and I agree that I may borrow up to the maximum only one time (and subject to all other conditions).

**INTEREST:** I agree to pay interest on the outstanding principal balance from 03/25/09 at the rate of 5.50 % per year until
the first schedule rate change - 04/01/09

☒ **Variable Rate:** This rate may then change as stated below.

    ☒ **Index Rate:** The future rate will be ___ 2.00% Above ___ the following index rate:
        THE HIGHEST PRIME RATE AS STATED IN THE MONEY RATES TABLE IN THE
        WALL STREET JOURNAL

    ☐ **No Index:** The future rate will not be subject to any internal or external index. It will be entirely in your control.

    ☒ **Frequency and Timing:** The rate on this note may change as often as ___ Monthly
        A change in the interest rate will take effect on the first day of each month. (If The Index Changes)

    ☒ **Limitations:** During the term of this loan, the applicable annual interest rate will not be more than ___ 21.00 ___ % or less than
         5.50 %. The rate may not change more than ___ 5.00 ___ % each ___ Month ___ .

    **Effect of Variable Rate:** A change in the interest rate will have the following effect on the payments:
    ☐ The amount of each scheduled payment will change.    ☒ The amount of the final payment will change.
    ☐

**ACCRUAL METHOD:** Interest will be calculated on a ___ Actual/365 ___ basis.

**POST MATURITY RATE:** I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:
    ☒ on the same fixed or variable rate basis in effect before maturity (as indicated above).
    ☐ at a rate equal to _____

☒ **LATE CHARGE:** If a payment is more than ___ 10 ___ days after it is due, I agree to pay a late charge of _____
    5.000% OF THE PAYMENT

☐ **ADDITIONAL CHARGES:** In addition to interest, I agree to pay the following charges which ☐ are ☐ are not included in the principal
    amount above: _____

**PAYMENTS:** I agree to pay this note as follows:
☐ **Interest:** I agree to pay accrued interest _____

☐ **Principal:** I agree to pay the principal _____

☒ **Installments:** I agree to pay this note in ___ 24 ___ payments. The first payment will be in the amount of $ 735.35
    and will be due ___ APRIL 25, 2009 ___ . A payment of $ 735.35 ___ will be due
    on the 25th day of each month _____ thereafter. The final payment of the entire
    unpaid balance of principal and interest will be due ___ MARCH 25, 2011 _____

☐ **Unpaid Interest:** Any accrued interest not paid when due (whether due by reason of a schedule of payments or due because of Lender's demand)
    will become part of the principal thereafter, and will bear interest at the interest rate in effect from time to time as provided for in this
    agreement.

**ADDITIONAL TERMS:** ANNUAL FINANCIAL STATEMENT AND TAX RETURNS TO BE PROVIDED TO THE
LAPORTE SAVINGS BANK.

---

☒ **SECURITY:** This note is separately secured by (describe separate document by type and date):
MORTGAGE DATED 05/31/2005 ON 1251 PINE
LAKE AVE, LAPORTE IN 46350

(This section is for your internal use. Failure to list a separate security document does not mean the agreement will not secure this note.)

**PURPOSE:** The purpose of this loan is _____
REFINANCE LPSB #6010056

**SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE (INCLUDING THOSE ON PAGE 2).** I have received a copy on today's date.

Kwitchurbeliakin L.L.C.

*Luise Marie Lesser*
LUISE MARIE LESSER, MEMBER

*Todd A Appel*
TODD A APPEL, MEMBER

Signature for Lender

The LaPorte Savings Bank

*Kent B. Porter*

KENT B. PORTER
ASSISTANT VICE PRESIDENT

UNIVERSAL NOTE
Experta © 1984, 1991 Bankers Systems, Inc., St. Cloud, MN Form UN-IN 3/6/2002

*(page 1 of 2)*

Cases lend, ⚹❌☒⚹❌ [and] means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us").

**DEFINITIONS:** As used on page 1, "☒" means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

**APPLICABLE LAW:** The law of the state of Indiana will govern this note. Any term of this note which is contrary to applicable law will not be effective, unless the law permits you and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

**COMMISSIONS OR OTHER REMUNERATION:** I understand and agree that any insurance premiums paid to insurance companies as part of this note will involve money retained by you or paid back to you as commissions or other remuneration.

In addition, I understand and agree that some other payments to third parties as part of this note may also involve money retained by you or paid back to you as commissions or other remuneration.

**PAYMENTS:** Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe our agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary).

**INTEREST:** Interest accrues on the principal remaining unpaid from time to time, until paid in full. If I receive the principal in more than one advance, and each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal advanced at that time. You and I may provide in this agreement for accrued interest not paid when due to be added to principal. Notwithstanding anything to the contrary, I do not agree to pay and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to here (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it, and if you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

**INDEX RATE:** The index will serve only as a device for setting the rate on this note. You do not guarantee by selecting this index, or the margin, that the rate on this note will be the same rate you charge on any other loans or class of loans to me or other borrowers.

**ACCRUAL METHOD:** The amount of interest that I will pay on this loan will be calculated using the interest rate and accrual method stated on page 1 of this note. For the purpose of interest calculation, the accrual method will determine the number of days in a "year." If no accrual method is stated, then you may use any reasonable accrual method for calculating interest.

**POST MATURITY RATE:** For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 of this note or the date you accelerate payment on the note, whichever is earlier.

**SINGLE ADVANCE LOANS:** If this is a single advance loan, you and I expect that you will make only one advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph below, or if we have agreed that accrued interest not paid when due will be added to principal.

**MULTIPLE ADVANCE LOANS:** If this is a multiple advance loan, you and I expect that you will make more than one advance of principal. If this is closed end credit, repaying a part of the principal will not entitle me to additional credit.

**PAYMENTS BY LENDER:** If you are authorized to pay, on my behalf, charges I am obligated to pay (such as property insurance premiums), then you may treat those payments made by you as advances and add them to the unpaid principal under this note, or you may demand immediate payment of the charges.

**SET-OFF:** I agree that you may set off any amount due and payable under this note against any right I have to receive money from you.

"Right to receive money from you" means:

(1) any deposit account balance I have with you;

(2) any money owed to me on an item presented to you or in your possession for collection or exchange; and

(3) any repurchase agreement or other nondeposit obligation.

"Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set off. This total includes any balance the due date for which you properly accelerate under this note.

If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of my accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right of set-off.

**REAL ESTATE OR RESIDENCE SECURITY:** If this note is secured by real estate or a residence that is personal property, the existence of a default and your remedies for such a default will be determined by applicable law, by the terms of any separate instrument creating the security interest and, to the extent not prohibited by law and not contrary to the terms of the separate security instrument, by the "Default" and "Remedies" paragraphs herein.

**DEFAULT:** I will be in default if any one or more of the following occur (1) I fail to make a payment on time or in the amount due; (2) I fail to keep the property insured, if required; (3) I fail to pay, or keep any promise, on any debt or agreement I have with you; (4) any other creditor of mine attempts to collect any debt I owe him through court proceedings; (5) I die, am declared incompetent, make an assignment for the benefit of creditors, or become insolvent (either because my liabilities exceed my assets or I am unable to pay my debts as they become due); (6) I make any written statement or provide any financial information that is untrue or inaccurate at the time it was provided; (7) I do or fail to do something which causes you to believe that you will have difficulty collecting the amount I owe you; (8) any collateral securing this note is used in a manner or for a purpose which threatens confiscation by a legal authority; (9) I change my name or assume an additional name without first notifying you before making such a change; (10) I fail to plant, cultivate and harvest crops in due season; (11) any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

**REMEDIES:** If I am in default on this note you have, but are not limited to, the following remedies:

(1) You may demand immediate payment of all I owe you under this note (principal, accrued unpaid interest and other accrued charges).

(2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "Set-Off" paragraph herein.

(3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not using any other remedy.

(4) You may refuse to make advances to me or allow purchases on credit by me.

(5) You may use any remedy you have under state or federal law.

By selecting any one or more of these remedies you do not give up your right to later use any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to later consider the event as a default if it continues or happens again.

**COLLECTION COSTS AND ATTORNEY'S FEES:** I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER:** I give up my rights to require you to do certain things. I will not require you to:

(1) demand payment of amounts due (presentment);

(2) obtain official certification of nonpayment (protest); or

(3) give notice that amounts due have not been paid (notice of dishonor).

I waive any defenses I have based on suretyship or impairment of collateral. I also give up my rights I may have under any valuation and appraisement laws which apply to me.

**OBLIGATIONS INDEPENDENT:** I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may do so without any notice that it has not been paid (notice of dishonor). You may without notice release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not release me from my duty to pay it. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit or notice and for any term without affecting my liability for payment of the note. I will not assign my obligation under this agreement without your prior written approval.

**FINANCIAL INFORMATION:** I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

**NOTICE:** Unless otherwise required by law, any notice to me shall be given by delivering it or by mailing it by first class mail addressed to me at my last known address. My current address is on page 1. I agree to inform you in writing of any change in my address. I will give any notice to you by mailing it first class to your address stated on page 1 of this agreement, or to any other address that you have designated.

| DATE OF TRANSACTION | PRINCIPAL ADVANCE | BORROWER'S INITIALS (not required) | PRINCIPAL PAYMENTS | PRINCIPAL BALANCE | INTEREST RATE | INTEREST PAYMENTS | INTEREST PAID THROUGH: |
|---|---|---|---|---|---|---|---|
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |

Experi, © 1984, 1991 Bankers Systems, Inc., St. Cloud, MN Form UN-IN 3/6/2002

INDIANA ABSTRACT & GUARANTY CORP.

LAPORTE COUNTY RECORDER
BARBARA DEAN

2005R-2078

11/17/2005    01:17:51PM

RECORDING FEE    $32.00
PAGES:  11

#6099263
#8110055
#6010056

———— **State of Indiana** ———————————**Space Above This Line For Recording Data**————

# REAL ESTATE MORTGAGE
### (With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is <u>NOVEMBER 10, 2005</u>.
   The parties and their addresses are:
   MORTGAGOR:    KWITCHURBELIAKIN, LLC AS TO PARCEL 1
          LUISE LESSER, AS TO PARCEL 2.
          355 CANTERBURY DR
          LAPORTE, IN 46350

   ☐ If checked, refer to the attached Addendum incorporated herein, for additional Mortgagors,
    their signatures and acknowledgments.
   LENDER:
         The LaPorte Savings Bank
         710 Indiana Ave
         La Porte, IN 46350

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is
   acknowledged, and to secure the Secured Debt (defined below) and Mortgagor's performance
   under this Security Instrument, Mortgagor grants, bargains, conveys, mortgages and warrants to
   Lender the following described property:

     *SEE EXHIBIT 'A' ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.

   The property is located in <u>LAPORTE</u>       at_____
               (County)
   <u>1251 PINE LAKE AVE & 2525E 850N</u>, <u>La Porte</u>   , Indiana <u>46350</u>
     (Address)         (City)       (Zip Code)

   INDIANA - AGRICULTURAL/COMMERCIAL REAL ESTATE SECURITY INSTRUMENT
   (NOT FOR FNMA, FHLMC, FHA OR VA USE, AND NOT FOR CONSUMER PURPOSES)
   Exßerß © 1994, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IN 1/7/2003     *(page 1 of 9)*



EXHIBIT

D

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber, all diversion payments or third party payments made to crop producers, all water and riparian rights, wells, ditches, reservoirs, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ <u>75,000.00</u> . This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:

   A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(ies) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. *(When referencing the debts below it is suggested that you include items such as borrowers' names, note amounts, interest rates, maturity dates, etc.)*

   ```
   Loan Dated NOVEMBER 10, 2005  In The Amount Of $75,000.00
   Accruing At A Variable Rate With A Maturity Date Of NOVEMBER 10, 2008  .
   Said Loan In The Name(s) Of Kwitchurbeliakin LLC
   ```

   B. All future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt existing now or executed after this Security Instrument whether or not this Security Instrument is specifically referenced. If more than one person signs this Security Instrument, each Mortgagor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Mortgagor, or any one or more Mortgagor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.

   C. All obligations Mortgagor owes to Lender, which now exist or may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Mortgagor and Lender.

   D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

   This Security Instrument will not secure any other debt if Lender fails to give any required notice of the right of rescission.

5. **PAYMENTS.** Mortgagor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

6. **WARRANTY OF TITLE.** Mortgagor warrants that Mortgagor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to grant, bargain, convey, sell, mortgage and warrant the Property. Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.

7. **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:

   A. To make all payments when due and to perform or comply with all covenants.

   B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.

   C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

8. **CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to

Experᵗ © 1994, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IN 1/7/2003

Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

9. **DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Security Instrument is released.

10. **TRANSFER OF AN INTEREST IN THE MORTGAGOR.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Lender may demand immediate payment if:
    A. A beneficial interest in Mortgagor is sold or transferred.
    B. There is a change in either the identity or number of members of a partnership or similar entity.
    C. There is a change in ownership of more than 25 percent of the voting stock of a corporation or similar entity.

    However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Security Instrument.

11. **ENTITY WARRANTIES AND REPRESENTATIONS.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Mortgagor makes to Lender the following warranties and representations which shall continue as long as the Secured Debt remains outstanding:
    A. Mortgagor is duly organized and validly existing in Mortgagor's state of incorporation or organization. Mortgagor is in good standing in all states in which Mortgagor transacts business. Mortgagor has the power and authority to own the Property and to carry on its business as now being conducted and, as applicable, is qualified to do so in each state in which Mortgagor operates.
    B. The execution, delivery and performance of this Security Instrument by Mortgagor and the obligations evidenced by the Secured Debt are within the power of Mortgagor, have been duly authorized, have received all necessary governmental approval, and will not violate any provision of law, or order of court or governmental agency.
    C. Other than previously disclosed in writing to Lender, Mortgagor has not changed its name within the last ten years and has not used any other trade or fictitious name. Without Lender's prior written consent, Mortgagor does not and will not use any other name and will preserve its existing name, trade names and franchises until the Secured Debt is satisfied.

12. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor shall not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor, and of any loss or damage to the Property.

    No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Security Instrument. Mortgagor shall not partition or subdivide the Property without Lender's prior written consent.

    Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Mortgagor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

13. **AUTHORITY TO PERFORM.** If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps

Express™ © 1994, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IN 1/7/2003

necessary to protect Lender's security interest in the Property, including completion of the construction.

14. **ASSIGNMENT OF LEASES AND RENTS.** Mortgagor assigns, grants, bargains, conveys, mortgages and warrants to Lender as additional security all the right, title and interest in the following (Property).

  A. Existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including but not limited to, any extensions, renewals, modifications or replacements (Leases).

  B. Rents, issues and profits, including but not limited to, security deposits, minimum rents, percentage rents, additional rents, common area maintenance charges, parking charges, real estate taxes, other applicable taxes, insurance premium contributions, liquidated damages following default, cancellation premiums, "loss of rents" insurance, guest receipts, revenues, royalties, proceeds, bonuses, accounts, contract rights, general intangibles, and all rights and claims which Mortgagor may have that in any way pertain to or are on account of the use or occupancy of the whole or any part of the Property (Rents).

In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement.

Mortgagor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default. Mortgagor will not collect in advance any Rents due in future lease periods, unless Mortgagor first obtains Lender's written consent. Upon default, Mortgagor will receive any Rents in trust for Lender and Mortgagor will not commingle the Rents with any other funds. When Lender so directs, Mortgagor will endorse and deliver any payments of Rents from the Property to Lender. Amounts collected will be applied at Lender's discretion to the Secured Debts, the costs of managing, protecting and preserving the Property, and other necessary expenses. Mortgagor agrees that this Security Instrument is immediately effective between Mortgagor and Lender and effective as to third parties on the recording of this Assignment.

As long as this Assignment is in effect, Mortgagor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants. Mortgagor, at its sole cost and expense, will keep, observe and perform, and require all other parties to the Leases to comply with the Leases and any applicable law. If Mortgagor or any party to the Lease defaults or fails to observe any applicable law, Mortgagor will promptly notify Lender. If Mortgagor neglects or refuses to enforce compliance with the terms of the Leases, then Lender may, at Lender's option, enforce compliance.

Mortgagor will not sublet, modify, extend, cancel, or otherwise alter the Leases, or accept the surrender of the Property covered by the Leases (unless the Leases so require) without Lender's consent. Mortgagor will not assign, compromise, subordinate or encumber the Leases and Rents without Lender's prior written consent. Lender does not assume or become liable for the Property's maintenance, depreciation, or other losses or damages when Lender acts to manage, protect or preserve the Property, except for losses and damages due to Lender's gross negligence or intentional torts. Otherwise, Mortgagor will indemnify Lender and hold Lender harmless for all liability, loss or damage that Lender may incur when Lender opts to exercise any of its remedies against any party obligated under the Leases.

15. **LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** Mortgagor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

16. **DEFAULT.** Mortgagor will be in default if any of the following occur:

  A. Any party obligated on the Secured Debt fails to make payment when due;

  B. A breach of any term or covenant in this Security Instrument or any other document executed for the purpose of creating, securing or guarantying the Secured Debt;

  C. The making or furnishing of any verbal or written representation, statement or warranty to Lender that is false or incorrect in any material respect by Mortgagor or any person or entity obligated on the Secured Debt;

  D. The death, dissolution, or insolvency of, appointment of a receiver for, or application of any debtor relief law to, Mortgagor or any other person or entity obligated on the Secured Debt;

*(page 4 of 9)*

E. A good faith belief by Lender at any time that Lender is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment is impaired or the value of the Property is impaired;

F. A material adverse change in Mortgagor's business including ownership, management, and financial conditions, which Lender in its opinion believes impairs the value of the Property or repayment of the Secured Debt; or

G. Any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

**17. REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Mortgagor is in default.

At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the terms of the Secured Debt, this Security Instrument and any related documents. All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

**18. EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Mortgagor agrees to pay all of Lender's expenses if Mortgagor breaches any covenant in this Security Instrument. Mortgagor will also pay on demand any amount incurred by Lender for insuring, inspecting, preserving or otherwise protecting the Property and Lender's security interest. These expenses will bear interest from the date of the payment until paid in full at the highest interest rate in effect as provided in the terms of the Secured Debt. Mortgagor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. This Security Instrument shall remain in effect until released. Mortgagor agrees to pay for any recordation costs of such release.

**19. ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

Mortgagor represents, warrants and agrees that:

A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

C. Mortgagor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.

D. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law.

Experi™ © 1994, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IN 1/7/2003

Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

E. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are and shall remain in full compliance with any applicable Environmental Law.

F. Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

G. Mortgagor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

H. Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

I. Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

J. Lender has the right, but not the obligation, to perform any of Mortgagor's obligations under this section at Mortgagor's expense.

K. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Security Instrument and in return Mortgagor will provide Lender with collateral of at least equal value to the Property secured by this Security Instrument without prejudice to any of Lender's rights under this Security Instrument.

L. Notwithstanding any of the language contained in this Security Instrument to the contrary, the terms of this section shall survive any foreclosure or satisfaction of this Security Instrument regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

20. **CONDEMNATION.** Mortgagor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

21. **INSURANCE.** Mortgagor agrees to maintain insurance as follows:

A. Mortgagor shall keep the Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Mortgagor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Mortgagor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Mortgagor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Mortgagor.

*(page 6 of 9)*

Unless otherwise agreed in writing, all insurance proceeds shall be applied to restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of scheduled payment nor change the amount of any payment. Any excess will be paid to the Mortgagor. If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

B. Mortgagor agrees to maintain comprehensive general liability insurance naming Lender as an additional insured in an amount acceptable to Lender, insuring against claims arising from any accident or occurrence in or on the Property.

C. Mortgagor agrees to maintain rental loss or business interruption insurance, as required by Lender, in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing), under a form of policy acceptable to Lender.

22. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

23. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and Lender's lien status on the Property.

24. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Mortgagor signs this Security Instrument but does not sign an evidence of debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. Mortgagor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Security Instrument. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Mortgagor and Lender.

25. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Security Instrument is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

26. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one mortgagor will be deemed to be notice to all mortgagors.

27. **WAIVERS.** Except to the extent prohibited by law, Mortgagor waives and releases any and all rights and remedies Mortgagor may now have or acquire in the future relating to redemption, reinstatement, and the marshalling of liens and assets. Mortgagor waives all rights of valuation and appraisement.

28. **U.C.C. PROVISIONS.** If checked, the following are applicable to, but do not limit, this Security Instrument:

☐ **Construction Loan.** This Security Instrument secures an obligation incurred for the construction of an improvement on the Property.

☐ **Fixture Filing.** Mortgagor grants to Lender a security interest in all goods that Mortgagor owns now or in the future and that are or will become fixtures related to the Property.

*(page 7 of 9)*

☐ **Crops; Timber; Minerals; Rents, Issues and Profits.** Mortgagor grants to Lender a security interest in all crops, timber and minerals located on the Property as well as all rents, issues, and profits of them including, but not limited to, all Conservation Reserve Program (CRP) and Payment in Kind (PIK) payments and similar governmental programs (all of which shall also be included in the term "Property"). Lender may file a financing statement signed by Lender instead of Mortgagor with appropriate public officials.

☐ **Personal Property.** Mortgagor grants to Lender a security interest in all personal property located on or connected with the Property, including all farm products, inventory, equipment, accounts, documents, instruments, chattel paper, general intangibles, and all other items of personal property Mortgagor owns now or in the future and that are used or useful in the construction, ownership, operation, management, or maintenance of the Property (all of which shall also be included in the term "Property"). The term "personal property" specifically excludes that property described as "household goods" secured in connection with a "consumer" loan as those terms are defined in applicable federal regulations governing unfair and deceptive credit practices. Lender may file a financing statement signed by Lender instead of Mortgagor with appropriate public officials.

☐ **Filing As Financing Statement.** Mortgagor agrees and acknowledges that this Security Instrument also suffices as a financing statement and any carbon, photographic or other reproduction may be filed of record for purposes of Article 9 of the Uniform Commercial Code.

**29. OTHER TERMS.** If checked, the following are applicable to this Security Instrument:

☐ **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

☐ **Separate Assignment.** The Mortgagor has executed or will execute a separate assignment of leases and rents. If the separate assignment of leases and rents is properly executed and recorded, then the separate assignment will supersede this Security Instrument's "Assignment of Leases and Rents" section.

☐ **Additional Terms.**

**SIGNATURES:** By signing below, Mortgagor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Mortgagor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

Entity Name: KWITCHURBELIAKIN  LLC _____      Entity Name: _____

_____                   _____
(Signature)                        (Date)           (Signature)                        (Date)
LUISE LESSER,  PRESIDENT                             TODD A APFEL,  VICE PRESIDENT

_____                   _____
(Signature)                        (Date)           (Signature)                        (Date)
LUISE LESSER

Experð © 1994, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IN 1/7/2003

**ACKNOWLEDGMENT:**

(Individual)

STATE OF _____ , COUNTY OF_____ } ss.

Before me, _____ , a Notary Public this _____ day of

_____ , _____

_____ acknowledged the execution of the annexed mortgage.

My commission expires:

(Notary Public) _____

(Notary's County) _____

(Business or Entity Acknowledgment)

STATE OF _____INDIANA_____ , COUNTY OF _____LAPORTE_____ } ss.

Before me, _____LISA M BALTES_____ , a Notary Public this __16th__ day of

__NOVEMBER__ , _____TODD CAPFEL, VICE PRESIDENT AND LUISE LESSER, PRES._____

AS TO PARCEL 1 & LUISE LESSER, AS TO PARCEL 2 _____ (Titles)

of _____KWITCHURBELIAKIN_____ (Name of Business Entity)

a __LIMITED LIABILITY COMPANY , AS TO PARCEL 1__ acknowledged the execution of the

annexed mortgage of the business or entity.

My commission expires: OCTOBER 2, 2013

(Notary Public) _____

                        LISA M BALTES

(Notary's County) _____LAPORTE_____

This instrument was prepared by (name, address): The LaPorte Savings Bank
710 Indiana Ave
La Porte, IN 46350

(page 9 of 9)

Experl™ © 1994, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IN 1/7/2003

## DESCRIPTION:

### PARCEL #1

A parcel of land lying in the Northeast Quarter (NE¼) of Section Twenty-seven (27), Township Thirty-seven (37) North, Range Three (3) West, LaPorte County, Indiana, more particularly described as follows:

Starting at a bolt marking the Northeast corner of Section Twenty-seven (27); thence South Eighty-nine degrees Fifty-seven minutes West (S 89° 57' W) along the North line of said Section, a distance of Three hundred Thirty-two (332) feet to an iron pipe; thence South Six degrees Thirty-five minutes East (S 06° 35' E), a distance of Five hundred Twenty-six and Eleven hundredths (526.11) feet to an iron pipe; thence South Seventy-three degrees Three minutes East (S 73° 03' E), a distance of Ninety-five and Seventy hundredths (95.70) feet to an iron pipe on the West right-of-way line of State Road #39; thence South Twenty degrees Twenty-one minutes West (S 20° 21' W) along said right-of-way line, a distance of One hundred Forty-five and Forty-two hundredths (145.42) feet to the point of curvature of a curve, said curve having a degree of curvature of Six degrees Thirty minutes (06° 30') on the centerline of said Road, a central angle of Nineteen degrees Forty six minutes (19° 46') a tangent length on the centerline of the Road of One hundred Fifty-three and Sixty hundredths (153.60) feet, a curve length of Three hundred Four and Ten hundredths (304.10) feet and an external distance of Thirteen and Thirty hundredths (13.30) feet; thence South Twenty degrees Twenty-one minutes West (S 20° 21' W), a distance of One hundred Sixty-five and Ninety-three hundredths (165.93) feet on a tangent to the curved right-of-way line of said Road to the point of intersection of said tangents; thence South Zero degrees Thirty-five minutes West (S 00° 35' W), a distance of One hundred Sixty-five and Ninety-three hundredths (165.93) feet on a tangent to said curved right-of-way to the point of tangency of said curve; thence South Zero degrees Thirty-five minutes West (S 00° 35' W), a distance of One hundred Twelve and Fifty-seven hundredths (112.57) feet along said right-of-way to the intersection of the Northerly right-of-way of U. S. Highway #35; thence North Fifty-two degrees Fifty-seven minutes West (N 52° 57' W), a distance of One hundred Thirteen and Sixty-six hundredths (113.66) feet on a tangent to the curved right-of-way of said Highway to the point of intersection of said tangents, said curve having a degree of curvature of Three degrees Forty-five minutes (03° 45') on the centerline of the Road; thence North Sixty-two degrees Forty-one minutes West (N 62° 41' W), a distance of One hundred Seventy-six and Thirty-four hundredths (176.34) feet on the tangent to said curved right-of-way to an iron pipe for a point of beginning; thence North Sixty-two degrees Forty-one minutes West (N 62° 41' W), a distance of Twenty-one and Ninety-six hundredths (21.96) feet on the tangent to said curved right-of-way to the point of tangency of said curve; thence North Sixty-two degrees Forty-one minutes West (N 62° 41' W), a distance of Two hundred Fifty-six and Four hundredths (256.04) feet to an iron pipe; thence North Twenty-seven degrees Fourteen minutes East (N 27° 14' E), a distance of Four hundred (400) feet to an iron pipe; thence South Sixty-two degrees Forty-one minutes East (S 62° 41' E), a distance of Two hundred Seventy-eight (278) feet to an iron pipe; thence South Twenty-seven degrees Fourteen minutes West (S 27° 14' W), a distance of Four hundred (400) feet to the point of beginning; containing Two and Five hundred Fifty-three thousandths (2.553) acres, more or less.

EXCEPT:

A part of the Northeast Quarter (NE¼) of Section Twenty-seven (27), Township Thirty-seven (37) North, Range Three (3) West, LaPorte County, Indiana, described as follows: Commencing at the Northeast corner of said Section; thence South Eighty-eight degrees Fifty minutes Thirty-seven seconds West (S 88° 50' 37" W), a distance of Three hundred Thirty-two (332.00) feet along the North line of said Section; thence South Seven degrees Forty-one minutes Twenty-three seconds East (S 07° 41' 23" E), a distance of Five hundred Twenty-six and Eleven hundredths (526.11) feet; thence South Seventy-four degrees Nine minutes Twenty-three seconds East (S 74° 09' 23" E), a distance of Ninety-five and Seventy hundredths (95.701) feet to the Western boundary of State Road #39; thence South Nineteen degrees Fourteen minutes Thirty-seven seconds West (S 19° 14' 37" W), a distance of One hundred Forty-five and Forty-two hundredths (145.42) feet along the boundary of said State Road #39; thence South Nineteen degrees Fourteen minutes Thirty-seven seconds West (S 19° 14' 37" W), a distance of One hundred Sixty-five and Ninety-three hundredths (165.93) feet; thence South Zero degrees Thirty-one minutes Twenty-three seconds East (S 00° 31' 23" E), a distance of One hundred Sixty-five and Ninety-three hundredths (165.93) feet to the Western boundary of said State Road #39; thence South Zero degrees Thirty-one minutes Twenty-three seconds East (S 00° 31' 23" E), a distance of One hundred Twelve and Fifty-seven hundredths (112.57) feet along the boundary of said State Road #39; thence North Fifty-four degrees Three minutes Twenty-three seconds West (N 54° 03' 23" W), a distance of One hundred Thirteen and Sixty-six hundredths (113.66) feet; thence North Sixty-three degrees Forty-nine minutes Twenty-five seconds West (N 63° 49' 25" W), a distance of One hundred Seventy-six and Thirty-four hundredths (176.34) feet to the Southeastern line of the owner's land; thence South Twenty-six degrees Seven minutes Thirty-seven seconds West (S 26° 07' 37" W), a distance of Nineteen and Ninety hundredths (19.90) feet along the Southeastern line to the centerline of U. S. R. #35 (also known as Pine Lake Avenue) and the South corner of the owner's land; thence North Sixty-three degrees Forty-seven minutes Twenty-three seconds West (N 63° 47' 23" W), a distance of Two hundred Seventy-eight (278.00) feet along the centerline to the West corner of the owner's land; thence North Twenty-six degrees Seven minutes Thirty-seven seconds East (N 26° 07' 37" E), a distance of Forty and Twelve hundredths (40.12) feet along the Northwestern line of the owner's land; thence South Sixty-five degrees Fifty-five minutes Thirty-eight seconds East (S 65° 55' 38" E), a distance of One hundred Thirty-eight and Ninety-three hundredths (138.93) feet; thence South Seventy-two degrees Thirty-six minutes Thirty-nine seconds East (S 72° 36' 39" E), a distance of Sixty-five and Seventy-six hundredths (65.76) feet; thence South Sixty-three degrees Twenty-seven minutes Forty seconds East (S 63° 27' 40" E), a distance of Seventy-four and Sixteen hundredths (74.16) feet to the Southeastern line of the owner's land; thence South Twenty-six degrees Seven minutes Thirty-seven seconds West (S 26° 07' 37" W), a distance of Thirty-five and Seven hundredths (35.07) feet along said Southeastern line to the point of beginning and containing Three hundred Five thousandths (0.305) acre, more or less. The portion of the above described real estate which is not already embraced within public rights of way contains One hundred Seventy-eight thousandths (0.178) acre, more or less.